**IN THE COURT OF APPEALS OF IOWA**

No. 14-0981
Filed July 22, 2015

**IN THE INTEREST OF C.Y.-E.,**
**Minor Child,**

**C.E., Father,**
**Appellant,**

_____

Appeal from the Iowa District Court for Dubuque County, Thomas J. Straka, Associate Juvenile Judge.

A father appeals the termination of his parental rights. **AFFIRMED.**

Christopher M. Soppe, Dubuque, for appellant father.

Daniel McClean, of McClean & Heavens Law Offices, Dyersville, for appellant intervenor.

Thomas J. Miller, Attorney General, Kathrine S. Miller-Todd, Assistant Attorney General, Ralph Potter, County Attorney, and Joshua A. Vander Ploeg, Assistant County Attorney, for appellee State.

Zeke R. McCartney of Reynolds & Kenline, L.L.P., Dubuque, attorney and guardian ad litem for minor child.

Considered by Danilson, C.J., and Vaitheswaran and Doyle, JJ.

**DOYLE, J.**

A father appeals the termination of his parental rights. We affirm.

### I. Background Facts and Proceedings.

C.E. is the father and S.Y. is the mother of C.Y.-E., born in March 2012. The child's parents both have a history of substance abuse. The child tested positive for oxycodone exposure at birth. At that time, the father was married to N.E. Because the child's mother was scheduled to serve a jail sentence shortly after the child's birth, the mother arranged that the child be cared for by the father and N.E.

The father and N.E. married in 2007, and they had had marital problems for some time. Prior to their marriage, the father and N.E. each had two founded child-abuse reports in 2004 concerning another child for denial of critical care for failure to provide proper supervision and presence of illegal drugs. The couple tragically lost another child in an accident in 2011.

In June 2012, N.E. kicked the father out of their home. The father took the child with him, and concerns were conveyed to the Iowa Department of Human Services (DHS) regarding the father's ability to care for the child safely. It was reported the father had not given the child his medication as needed, had not fed the child properly, and had driven with the child on his lap, among other things. The DHS case worker noted the father "would use [the child] to get to [N.E.] so that she would allow him back in the home. He knew that [N.E.] wanted to be a part of [the child's] life and would use that to get what he wanted." Voluntary services were offered to the family, and eventually the child and the father resumed living with N.E.

In February 2013, N.E. served the father divorce papers, and the father "responded poorly to this and threatened to harm himself," barricading himself in the bathroom with a gun. N.E. heard what sounded like a shotgun being loaded, and she got out of the home and called 9-1-1; the child remained in the home. After arriving, law enforcement officials attempted to talk the father into coming outside for thirty to forty minutes with no response. The officers then went into the home to locate the father to bring him and the child out safely, but the father had somehow fled the home, leaving the child alone in the house. While searching for the father in the home, officers found methamphetamine precursors and drug paraphernalia in the basement. The father returned home and was arrested and charged with child endangerment and possession of precursors. A no-contact order between the father and the child was entered thereafter. The child remained in N.E.'s care, but because the father was unable to care for the child while N.E. was at work, N.E. had the father's relatives care for the child when she was unable to do so.

Both the father and the child's hair tested positive for methamphetamine thereafter. N.E.'s drug tests were negative for illegal substances. The DHS case worker met with the father to discuss what plans he wanted to make for the child, "as there was still a no-contact order in place and [N.E.] was wanting to move forward with the divorce." N.E. joined the discussion, and though N.E. had been the child's primary caregiver since the child's birth, the father

> talked about having [the child] go and stay with [his relatives], so he could move back into the house with [N.E.]. He had stayed there two other nights when [the child] was with [his relatives]. [N.E.] said she didn't want [the father] at the house, but wanted to be part of [the child's] life. [N.E.] acknowledged that [the father] would use

> [the child] as a "pawn" to get what he wanted because he knew how attached [N.E.] is to [the child]. [The father] said if [N.E.] was going to go ahead with the divorce, he should leave [the child] with [his relatives]. The conversation did not go well. [N.E.] was emotional and upset that [the father] was talking about moving [the child] just because he wanted to hurt her. [The father] got upset with [N.E.] wanting to divorce him and losing his family. . . .
>
> [The father] did agree to sign a safety plan to agree to leave [the child] in the care of [his relatives] until . . . [the relatives] could arrange visitation with [N.E.].

The child has remained in the relatives' care since that time.

In March 2013, the State filed a petition asserting the child was a child in need of assistance (CINA), and a pre-hearing conference was set for the following month. The DHS case worker and service provider both noted the father went "back and forth about identifying [N.E.] as a caregiver for [the child]." At times he supported N.E. having visitation with the child, including overnight visits, only to change his mind and refuse N.E. visits with the child. Just before the pre-hearing conference, the DHS case worker reported the father indicated he wanted the child "to have contact with [N.E.], but not regular contact." Though the service provider discussed with the father the role N.E. had played in the child's life "and how no contact or inconsistent contact could negatively impact [the child]," the father "did not appear to care." Service providers had pointed out to the father that he had "a history of using [the child] to get to [N.E.] or get what he want[ed] from [N.E.]," but the father "typically ha[d] no response." Since N.E. was not the child's biological mother and the father did not want N.E. to have interactions with the child at that time, the DHS stopped visits between N.E. and the child.

Following the prehearing conference, the juvenile court entered a pre-hearing order directing that the child "be removed from parental custody and placed in the care, custody, and control of the [DHS] for appropriate . . . relative placement." The court also determined N.E. should have visitation with the child, and visits between N.E. and the child resumed.

The child was adjudicated a CINA in May 2013, and at the time of the adjudication hearing, both the mother and the father were incarcerated. The father remained in jail until the end of July 2013. While he was in jail and after his release, the father was offered services for reunification. However, by September 2013, the father was "on the run" with a warrant out for his arrest and federal charges pending. Between the time of his release and mid-September, he had had only two interactions with the child through the service provider, and though he could have gone to the relative caregivers' home to have additional visits with the child, he did not. Around the same time period, N.E. and the father's divorce was finalized.

In December 2013, the DHS case worker recommended the father's parental rights be terminated. The case worker explained she did "not feel that [the father] could take care of himself, let alone a child. There [were] significant mental health issues as well as substance abuse issues that [had] not been addressed." Thereafter, the State in January 2014 filed a petition seeking termination of the father's and mother's parental rights. The child's guardian ad litem also recommended termination of the parents' parental rights, and the county foster care review board supported the recommendation.

Hearing on the State's petition was held in May 2014. At that time, the father was again incarcerated, awaiting sentencing after having pled guilty to two counts of possession of precursors with intent to manufacture methamphetamine and one count of manufacturing methamphetamine. The father testified that pursuant to his plea agreement, the State was recommending he be placed in a residential correctional facility, but he would be requesting the sentencing court grant him a deferred judgment. The father testified that the best case scenario if he was placed at the facility was his release in three months, and even with the State's recommendation, the court could still impose a prison sentence of up to twenty years. The father admitted that since the case began in February 2013, he had only had three or four visits with the child and had not seen the child in seven months. Nonetheless, he testified he had no concerns if the child was placed in the care of N.E. or the mother, who was living with N.E. at that time. He believed either would allow him to see the child "once he [got] through [his] legal issues."

Following the hearing, the juvenile court entered its order terminating the parents' parental rights. The father now appeals.[1] We review his claims de novo. *See In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014).

---

[1] We note that on June 23, 2015, the Iowa Supreme Court filed an order concerning this case and N.E.'s related appeals in appellate case numbers 14-0554 and 14-1419, explaining:

The father filed a notice of appeal and a petition on appeal following the termination of his parental rights. [N.E.] also filed a notice of appeal and petition on appeal in the same appellate case number. This court determined [N.E.'s] appeal was interlocutory[, renumbered her interlocutory appeal as number 14-0554,] and denied [N.E.'s] request [for interlocutory] appeal. Based on that order the clerk of the supreme court issued procedendo and this entire appeal was closed by the appellate clerk's office. A review of this file indicates that the procedendo should

## *II. Discussion.*

In determining whether parental rights should be terminated under chapter 232 (2013), the juvenile court "follows a three-step analysis." *See In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010). Step one requires the court to "determine if a ground for termination under section 232.116(1) has been established" by the State. *Id.* If the juvenile court finds grounds for termination, the court moves to the second step of the analysis: deciding if the grounds for termination should result in a termination of parental rights under the best-interest framework set out in section 232.116(2). *Id.* at 706-07. In making this determination, the primary considerations are the children's safety, their best placement for furthering their long-term nurturing and growth, and their physical, mental, and emotional conditions and needs. Iowa Code § 232.116(2) (2013). Even if the juvenile court finds "the statutory best-interest framework supports termination of parental rights," the court must proceed to the third and final step: considering "if any statutory exceptions set out in section 232.116(3) should serve to preclude termination of parental rights." *D.W.*, 791 N.W.2d at 707.

On appeal, the father asserts the State failed to prove the grounds for termination of his parental rights, and termination of his parental rights was not in the child's best interests, among other things. We address his arguments in turn.

---

only have applied to [N.E.'s] attempt [for interlocutory appeal in number 14-0554] filed on June 13, 2014. The court finds the father's appeal from the termination of his parental rights is still pending before this court. This appeal shall be transferred immediately to the court of appeals for disposition.

The father's case was then transferred to this court the same day.

### *A. Grounds for Termination.*

The grounds for termination must be proved by clear and convincing evidence. Iowa Code § 232.116(1); *see also D.W.*, 791 N.W.2d at 706. When the juvenile court terminates parental rights on more than one statutory ground, we may affirm on any ground we find supported by the record. *D.W.*, 791 N.W.2d at 707; *In re R.R.K.*, 544 N.W.2d 274, 276 (Iowa Ct. App. 1995). Here, the juvenile court found the State proved the grounds under Iowa Code subsection 232.116(1) paragraph (e) and (h). We choose to address the latter ground.

Iowa Code section 232.116(1)(h) provides parental rights may be terminated if the court finds by clear and convincing evidence that (1) the child is three years of age or younger, (2) has been adjudicated a CINA, (3) has been removed from the physical custody of his parents for at least six months of the last twelve months, and (4) there is clear and convincing evidence that the child cannot be returned to the custody of the child's parents at the present time. The father does not challenge that the first two elements were proved. However, he argues the statutory use of the word "parents" in Iowa Code section 232.116(1), in its plural form, requires removal of the child from all of the child's parents.[2] Because, as his argument goes, the child was never removed from N.E.'s

---

[2] Though Iowa Code section 232.116(1) subsections (e) and (h) both use the word "parents," the father only challenges subsection (e)'s use of the word. Because we need only affirm on one ground, we could ignore his argument as to subsection (e) and address only his explicit challenge to subsection (h), that the child could have been returned to his care. *See R.R.K.*, 544 N.W.2d at 276; *see also Hyler v. Garner*, 548 N.W.2d 864, 870 (Iowa 1996) ("[O]ur review is confined to those propositions relied upon by the appellant for reversal on appeal"); *In re D.S.*, 563 N.W.2d 12, 15 (Iowa Ct. App. 1997) (finding principles of res judicata barred a father who failed to appeal a juvenile court order from raising the challenge on appeal). Nevertheless, we choose to address it because the argument lacks merit.

custody, the State did not prove element three. Additionally, he argues the State failed to prove the child could not be returned to his custody. Upon our de novo review, we find the State met its burden.

Iowa Code section 232.2(39) defines the word "parent" as a biological or adoptive parent.[3] It does not include the word stepparent, which is mentioned in a separate subsection under the definition of "custodian," whose rights are "subject to any residual rights and duties remaining in a parent or guardian." *See* Iowa Code § 232.2(11)(a)-(c); *see also In re J.C.*, 857 N.W.2d 495, 501, 504 (Iowa 2014). Here, the State established the child was removed from the custody of his biological parents within the statutory time frame. We find that it met its burden as to element three.

Additionally, the father asserts that "[w]ithin a few days after the termination hearing [he] was released from custody." However, this assertion is outside the closed record, and there was no evidence at the hearing that the father would be immediately released. Therefore, we cannot consider it on appeal. *See State v. Weiland*, 202 N.W.2d 67, 69 (Iowa 1972) (noting appellate courts cannot consider facts that are outside of the record). Regardless, the father did nothing to work toward reunification with the child during the case. He excuses his lack of participation during the proceedings because he was incarcerated, and he further declares "[t]here was nothing in the record that the child could not be returned to [his] care." While conviction of a crime and resulting imprisonment do not necessarily result in termination of parental rights,

---

[3] *See* our opinion filed today in the related case, *In re C.Y.-E.*, No. 14-1419 (July 22, 2015), concerning N.E.'s appeal following the post-termination-placement hearing.

incarceration cannot justify a parent's lack of relationship with the child. *See In re M.M.S.*, 502 N.W.2d 4, 8 (Iowa 1993). Here, the father's incarceration is a result of his own actions, and he did nothing in the short amounts of time during the case when he was not incarcerated to evidence that he had any interest in addressing his substance abuse or mental health issues or, frankly, parenting the child. He had not even seen the child in at least seven months at the time of the termination-of-parental-rights hearing, and the father was incarcerated at the time of the hearing. There is no question the child could not be safely returned to the father's care at the time of the termination hearing. Accordingly, we agree with the juvenile court that the State proved the ground for termination of parental rights found in section 232.116(1)(h).

### B. Best Interests and Other Considerations.

The father's remaining arguments all concern N.E. The father asserts termination of his parental rights was not in the child's best interests because the child could be placed with N.E., arguing there was a sibling bond between the child and N.E.'s children. He weaves his argument into a claim that the juvenile court erred in finding "no consequential factors weigh[ed] against termination," claiming that at the time of the termination-of-parental-rights hearing, the child was in the custody of two relatives.

At the time of the termination-of-parental-rights hearing, the child had been in the care of the fathers' relatives for sixteen months. Moreover, it was at the father's request, perhaps against the child's best interests at that time, that the child was placed with his relatives because he was mad at N.E., even though at that time she had been the child's primary caregiver. The father's behavior

throughout the case evidences his lack of insight into the needs of a young child and his unwillingness to put someone else's needs before his own. At the time of the termination hearing, the child had been thriving in the care of the fathers' relatives and was in need of permanency. Though it is unclear if the child is bonded with his stepsiblings, there is no question he was bonded with N.E. However, he was also bonded with the fathers' relatives and their children. Regardless, neither relationship concerns the father's parental rights. We agree with the juvenile court that termination of the father's parental rights is in the child's best interests.

Finally, the father maintains it was error to terminate his parental rights "because the child was in the custody of a relative," citing Iowa Code section 232.116(3)(a). He maintains the child was in the custody of both N.E. and his relatives. This is factually incorrect. As of April 2013, the juvenile court removed the child "from parental custody and placed [the child] *in the care, custody, and control* of the [DHS] for appropriate . . . relative placement." (Emphasis added.) This means custody was placed with the DHS, not a relative. *See* Iowa Code § 232.116(3)(a); *see also A.M.*, 843 N.W.2d at 112, 113 (noting that although A.M. was in the care of her grandparents, she was not in their legal custody making section 232.116(3)(a) inapplicable). Consequently, section 232.116(3)(a) is inapplicable in the present case. *See id.*

### III. Conclusion.

For the foregoing reasons, we affirm the juvenile court's ruling terminating the father's parental rights.

**AFFIRMED.**