**In the Interest of M.M.S., A Minor Child.**

**B.C., Father, Appellant,**

**R.S., Mother, Appellee.**

No. 92–658.

Supreme Court of Iowa.

June 16, 1993.

James B. Malloy of Nelson, Johnson & Malloy, Ogden, for appellant.

Michael F. Mumma and Rita Harmening Pedersen of Mumma & Pedersen, Jefferson, for appellee.

Dennis W. Ladd, Jefferson, guardian ad litem for the child.

HARRIS, Justice.

This appeal challenges an order terminating the relationship between a father and his natural daughter. We agree with the trial court's finding of abandonment and affirm the order of termination. So doing we vacate a contrary decision by the court of appeals.

The proceedings were brought by the child's mother, pursuant to Iowa Code section 600A.8 (1991), which provides in pertinent part:

> The juvenile court shall base its findings and order [terminating parental rights] on clear and convincing proof. The following shall be, either separately or jointly, grounds for ordering termination of parental rights:
>
> ....
>
> 3. A parent has abandoned the child.

Iowa Code section 600A.2(16) defines abandonment this way:

> "*To abandon a minor child*" means to permanently relinquish or surrender, without reference to any particular person, the parental rights, duties, or privileges inherent in the parent-child relationship. The term includes both the intention to abandon and the acts by which the intention is evidenced. The term does not require that the relinquishment or surrender be over any particular period of time.

(The definitions contained in Iowa Code section 600A.2 have since been renumbered alphabetically; the definition of abandonment is now found in Iowa Code section 600A.2(17) (1993).)

Our review is de novo. Iowa R.App.P. 4. Although we are not bound by them, we give weight to the trial court's findings of fact, especially when considering credibility of witnesses. Iowa R.App.P. 14(f)(7). We think the following facts are established by clear and convincing evidence.

The child, Megan, now six years old, was born March 23, 1987. She is the natural child of the petitioner Rebecca and the respondent Brent. Rebecca and Brent were never married. Rebecca's pregnancy re-

sulted from a single encounter. Indeed the relationship between Brent and Rebecca could scarcely be more casual. They had never dated and were barely acquainted. Brent testified he had "only seen her a few times." Rebecca was fifteen when Megan was born. Brent was nineteen. At the time of the encounter, Rebecca was a high school freshman. Brent was a senior.

After this single encounter, Brent stepped completely out of Rebecca's life. The two never saw each other again. Brent has never been a part of Megan's life either; he has never seen her and has provided her with no support.

Brent concedes all of this, but thinks there was no abandonment because he was never adequately confronted with his paternity. At the time of Megan's birth, Rebecca believed another person was the father. The birth certificate does not show the name of a father. Although he certainly knew he was eligible, Brent chose to believe rumors that another person was Megan's father, and gave the matter no further attention. For reasons that will appear, Rebecca was not anxious to implicate Brent in Megan's life. Under the circumstances Megan spent her infancy oblivious of her father, and Brent spent those years oblivious of her.

There the matter would have undoubtedly remained but for the fact that, in 1990, the year Megan turned three, Rebecca sought public assistance. As a result the State pursued the matter of paternity, first against a person Rebecca then thought to be the father. When the blood test proved the first named was not the father, the State's attention turned to Brent.

Notwithstanding their casual association, Brent knew of Rebecca's pregnancy and concedes that, when he learned the first-named person was not the father, he "had a feeling maybe she was mine." He would have had this knowledge by the time the paternity action against him was filed April 18, 1990.

To say the least, Brent did not greet the news with unrestrained enthusiasm. On June 1 he filed a denial of paternity. On June 10 he signed a stipulation to submit to withdrawal of a blood specimen to test his paternity. Such a submission is a requirement upon motion of the court or either party. Iowa Code § 675.41 (since transferred and rewritten in Iowa Code § 600B.41 (1993)). Brent missed the first scheduled appointment but did appear by arrangement several days later. Results, confirming his paternity, were received by his counsel on August 21, and mailed to him the same date. The results prompted Brent to sign a stipulation of paternity on August 24, 1990. The stipulation was not filed in court until September 17.

On September 26, 1990, Brent entered federal prison, where he remains incarcerated. His incarceration is for possession with intent to distribute cocaine (five counts) and perjury (seven counts). He may be eligible for release to a half-way house in the fall of this year (1993), or for parole in March 1994.

Brent defends the charge of abandonment on the claim that association with his daughter was uncalled for prior to September 1990 and has been impossible since then. He contends he could not be expected to try to associate with Megan until he knew of their relationship, and he could not do so after his incarceration. In order to properly analyze Brent's claims, it will be necessary to describe him and retrace his steps.

Although Brent expresses some hopeful intentions to reform, and although there are indeed some signs of encouragement since he went to prison, Brent has a strong propensity for violence, a moderately extensive criminal history, and a history of drug addiction. There is no question concerning the following trial court findings:

> Brent is described as an individual who has been hot tempered, self-centered, and lived a "wild past." He has not maintained any steady employment. He admits to past alcohol and drug usage. He also has prior convictions for operating while intoxicated, assault causing bodily injury, false imprisonment and harassment. He has been in in-patient substance abuse treatment and underwent a batterer's program. Prior to his current

imprisonment, he had been incarcerated on two other occasions, once for 24 days. Two close friends of Brent are also in prison. During his current imprisonment, he failed to advise Rebecca of the change in the location of his incarceration to Yankton, South Dakota. . . .

The hot temper to which the trial court referred was manifested by rather extreme acts of violence, particularly with regard to women with whom Brent was associating. The assault causing bodily injury charge for which he was earlier incarcerated was one example. And Brent conceded he had threatened to harm another woman and that it "may be possible" that he had threatened to kill her. This propensity for violence is of great concern to Rebecca, and the cause for her reticence concerning his associating with Megan.

■ I. We think Brent is shown to have abandoned Megan. During Megan's first three years she became established within a family with Rebecca and later with a stepfather, Rebecca's husband. At the time of trial the family was expanded to include a half-brother. While she put these roots down, Megan had no association with Brent, or even awareness of him. During this period Rebecca alone and later her husband, certainly not Brent, bore all of the burdens, responsibilities and expenses of nurturing the child. While Megan was being so nurtured, Brent's abandonment was taking place and becoming complete. He must be charged with some sense of involvement on the basis of his encounter with Rebecca and his knowledge of her pregnancy that followed, even notwithstanding rumors of another father. Brent's lack of precise knowledge of his paternity may or may not have been deliberate. His lack of association with Megan may or may not have been understandable. He nevertheless demonstrated a willingness to stay completely outside Megan's life, and let others provide for all her care, and develop the association with her that he did not. This in time amounted to abandonment.

And just where was Brent during Megan's formative infant years? In early 1990, about the time the paternity suit was filed against him, Brent was so far into the drug culture as to be testifying before and lying to a federal grand jury about his own and an accomplice's activities in selling cocaine. These matters led to the criminal sentence Brent is now serving.

Brent argues he had only nine days from the filing of the paternity decree until his incarceration in which to establish a relationship he had so long chosen to ignore. We think he had far longer, and opted against it both by his indifference and his choice of lifestyle. During the months prior to his incarceration, the period when he was involved with the activities leading to his incarceration, Brent was forced to a growing awareness of Megan. He had, not only the nine days he claims, but a period of at least several weeks following the time when he was certain of his paternity before he began his incarceration. He took no advantage of it.

We are unpersuaded by Brent's claim of limited opportunities. In the first place it is he who is most responsible for his limited opportunities. As Rebecca testified, she "didn't send him to prison. He did that himself." Secondly, we think a showing of abandonment does not require a multitude of spurned opportunities. An abandoned child is no less abandoned because the parent can rationalize a reason for the abandonment. When opportunities for association with a child are few, they become more precious, and the spurning of them more egregious. If few opportunities for association are available, spurning all of them will suffice for a showing of abandonment. We think Brent's abandonment of Megan was complete at least by the time he entered prison.

One letter alone was sent during Megan's entire life professing an interest in her. It was sent with Brent's mother following her visit to him in prison. Like the trial court, we think the motivation for the letter came not from Brent, but from his mother. As the trial court said:

> During the pendency of the paternity
> action, Brent never contacted Rebecca to
> inquire about Megan or to arrange any

visitation. At that time, Rebecca lived in Jefferson, Iowa, and Brent was residing in Ankeny, Iowa. Arrangements were made for Brent to take his blood test for the paternity proceeding on July 11, 1990. He did not show up on that date although he subsequently submitted himself for a blood test on July 18, 1990. Notwithstanding the results of the blood test, Brent still made no effort to contact Rebecca or Megan. Brent has not sent any letters or cards to Megan except a Christmas card for Christmas 1990. Rebecca sent two letters to Brent seeking his consent to allow her husband ... to adopt Megan. Rebecca received no responses to those letters except a letter which Brent sent to his mother who subsequently delivered the letter to Rebecca. She received that letter approximately October, 1990, about the same time when ... Brent was sentenced to prison.

Brent contends that since his incarceration he has attempted through his parents to establish a relationship with Megan. We think the evidence supports only a finding that the grandparents have attempted to establish a relationship with her in substitution for Brent's wholesale failure to do so. The law does not authorize derailment of termination proceedings by grandparents, even honorable and heartbroken ones, such as Brent's parents appear to be.

■ II. These facts call for termination under the principles explained in *In re D.J.R.*, 454 N.W.2d 838, 841–42 (Iowa 1990) (abandonment established by failing to pursue relationship to whatever extent allowed by a no-contact order). Brent's feeble contacts must be viewed in the light that total desertion is not required for a showing of abandonment. *In re Goettsche*, 311 N.W.2d 104, 105 (Iowa 1981).

■ We do not hold or suggest that termination is a necessary result of conviction of a crime and resulting imprisonment. On the other hand Brent cannot use his incarceration as a justification for his lack of relationship with the child. This is especially true when the incarceration results from a lifestyle that is chosen in preference to, and at the expense of, a relationship with a child. *See In re J.S.*, 470 N.W.2d 48, 51 (Iowa App.1991) (incarceration is no justification for father's failed responsibilities; termination ordered); *In re R.L.F.*, 437 N.W.2d 599, 601–02 (Iowa App.1989) (mere generalized interest in child whom prisoner-father has not met cannot bar termination); *In re Griffin*, 210 N.W.2d 665, 667 (Iowa 1973) (while not deciding whether it amounts to abandonment, father's pursuit of crime in preference to family life warranted termination).

III. The facts here are in some ways the converse of those presented in *In re B.G.C.*, 496 N.W.2d 239 (Iowa 1992), a case in which we were obliged to uphold the parental rights of the natural father of a child also born out of wedlock. The controlling difference is that the father in that case, unlike Brent, began vigorously asserting his parental rights within a few weeks of his daughter's birth. Brent on the other hand chose to believe Megan was not his child.

■ We pointed out that, by mandate of the United States Supreme Court, due process rights accompany a father's relationship with a child, including a child born out of wedlock. *In re B.G.C.*, 496 N.W.2d at 244 (citing *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599, 606 (1982)). Of course under the supremacy clause of the federal constitution, this rule is binding on us, and on our legislature. Under this rule it is settled law in termination cases that, when termination is grounded on a claim of abandonment, the abandonment must be established by clear and convincing evidence before the courts are authorized to explore the issue of the child's best interests. *In re B.L.A.*, 357 N.W.2d 20, 23 (Iowa 1984) (after deciding statutory grounds for termination exist, we must determine whether it would benefit children); *In re Adoption of Hangartner*, 407 Pa. 601, 608–09, 181 A.2d 280, 284 (1962) (welfare of child does not become material in adoption proceedings until abandonment is established or consent of natural parent proven); 2 Am.Jur.2d *Adoption* § 60 (1962).

We do not suggest that Rebecca should prevail merely to avoid disruption of the stability in Megan's life brought about by the passage of time. The United States Supreme Court has pointed out that we must sometimes order the tragic disruption of a long but illegal child placement. *Mississippi Choctaw v. Holyfield*, 490 U.S. 30, 53–54, 109 S.Ct. 1597, 1610–11, 104 L.Ed.2d 29, 49–50 (1989) (law cannot be applied so as automatically to reward those who obtain custody, whether lawfully or otherwise, and maintain it during any ensuing—and protracted—litigation). The passage of time, and the bonding of a child to a foster home, led to profound but unavoidable hardship in *In re B.G.C.* But there is a crucial distinction between *In re B.G.C.* and this case. In *In re B.G.C.* the passage of time, with its tragic consequences, occurred while that father was litigating his parental rights. The time passed in the present case while no one showed an interest in Megan except for her mother and stepfather. The distinction is of surpassing importance.

IV. After carefully considering these principles, we conclude the facts we have detailed, for the reasons we have explained, amount to an abandonment by Brent and authorize and compel us to proceed to a consideration of Megan's best interests. *In re B.L.A.*, 357 N.W.2d at 23.

We do not consider the best interests question to be at all close. Megan is long established in an exemplary home. Her mother and stepfather enjoy a stable marriage. They can and do provide her with love and for all her material needs. They own a comfortable and debt-free home.

There is not always the urgency in chapter 600A termination cases that we have noted in termination cases under the juvenile code (Iowa Code § 232.109 *et seq.*). We nevertheless think it is past time to terminate for this six-year-old girl. *See In re B.L.A.*, 357 N.W.2d at 23–24 (termination ordered to allow adoption by a man who assumed role abandoned by natural father).

DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.

All Justices concur except SNELL, J., who concurs in divisions I, II, IV and the result.