**IN THE COURT OF APPEALS OF IOWA**

No. 14-1984
Filed February 10, 2016

**IN THE INTEREST OF T.B. AND M.C.,**
**Minor children,**

**D.B., Father,**
**Appellant,**

**B.B., Mother,**
**Appellant.**
_____

Appeal from the Iowa District Court for Polk County, Robert J. Blink, Judge.

A father and mother both appeal the district court's order terminating their parental rights to the children, T.B. and M.C. **AFFIRMED ON BOTH APPEALS.**

Karmen R. Anderson, Des Moines, for appellant father.

Jeremy L. Merrill of Lubinus Law Firm, P.L.L.C., Des Moines, for appellant mother.

Lynn C.H. Poschner of Borseth Law Office, Altoona, attorney and guardian ad litem for minor children.

Heard by Danilson, C.J., and Vogel and Potterfield, JJ.

**POTTERFIELD, Judge.**

A father and mother separately appeal the termination of their parental rights in a private termination action. Each argues that termination was improper because the guardian of their children both failed to prove abandonment under Iowa Code section 600A.8(3)(b) (2013) by clear and convincing evidence, and to prove that termination was in the best interests of the children involved. The mother further argues that termination was improper because she was prevented from maintaining regular physical visitation with her children by the guardian. Although we find the actions of the guardian troubling, we nevertheless agree with the district court that the father and mother have both abandoned their children within the meaning of section 600A.8(3)(b), and that termination of their parental rights is in the best interests of the children. We therefore affirm.

## I. Background Facts and Proceedings

This appeal concerns two children: T.B., a six-year-old boy born in 2009, and M.C., a nine-year-old boy born in 2007. T.B. is the child of both the mother and the father. M.C. is the child of the mother and another man. Both children have been in the continuous care of the guardian since the guardianship was established by agreement of the parents in May 2011. It has been even longer since either child has been in the care of his parents.

For approximately six months after T.B. was born in 2009, T.B. and M.C. lived with and were cared for by both the father and mother. But then the father lost his job and the mother moved out of the family's home with both children. The father has not lived with his son since. The mother remained in Iowa until November 2010, when she moved with the children to Florida. Three months

later, in February 2011, the mother decided to return to Iowa.  The children did not make the return trip.  The mother left the boys in Florida with her friend and has not been their primary caregiver since.  It was while the mother was back in Iowa without her children that the guardianship was conceived.  The mother and the father agreed that they would voluntarily enter into a guardianship agreement because they recognized that they needed help caring for their sons.  The older woman who was to become the boys' guardian was someone with whom they were already familiar and whom they trusted.  In fact, the guardian had previously adopted another of the father's biological children, T.B.'s half-brother.

The documents requesting the guardianship are two nearly-identical letters, handwritten by the mother on lined paper.  The two letters—one signed by the father, the other by the mother—were drafted at the Polk County courthouse with the help of the guardian and a judicial employee.[1]  The mother's letter reads:

> To whom it may concern,
>     I [the mother] want to have [the guardian] be the guardian of my two sons [M.C.] D.O.B. XX-XX-07 & [T.B.] D.O.B. XX-XX-09.  I feel it's for the best interest of the boys right now.
>     I just don't have the funds to provide for them.
> Sincerely,
> [the mother]
> [signature]

The father's letter reads:

> To whom it may concern,
>     I [the father] want to have [the guardian] be the guardian of my son [T.B.] D.O.B. XX-XX-09.

---

[1] It is not clear who assisted the father, mother, and guardian.  The mother recalls being helped by "the person in probate," while the guardian testified (in response to an unrelated question) that "[t]here was a judge [at the courthouse], and it was a lady judge. She helped us and walked us through everything.")

I feel it's for the best interest of my son cause I don't have the funds to take care of him.

I believe [T.B.] will be better off with [the guardian].

Sincerely,

[the father]

[signature] 5-8-2011

The mother maintains she and the father had a verbal agreement with the guardian about the intended nature and duration of the guardianship. The mother testified as follows at the termination hearing:

> Q. So you thought it would be in their best interest, for a temporary period of time, for [the guardian] to take care of them? A. Yes.
>
> Q. Whose idea was it to start the guardianship? A. I asked her if she could help, and then she recommended that we did [sic] a guardianship.
>
> Q. At the time she, [the guardian], suggested the guardianship, did you understand what a guardianship meant? A. No. All I thought it was, was a paper saying they could provide assistance for the child, like medical and stuff like that, and the parent could go back in and take that child back.
>
> Q. And in your discussions with [the guardian] about the guardianship, did you make it clear that you felt that this was going to be for a temporary basis? A. Yes.
>
> . . . .
>
> Q. At the time the guardianship was entered, did it contain provisions regarding ongoing visitation? A. No.
>
> Q. Did it contain any provisions about ongoing supports that you would provide? A. No. We just had a verbal understanding type of thing.
>
> . . . .
>
> Q. What was your understanding about how ongoing visitation would occur? A. That we would go with our verbal agreement where I'd be able to visit no matter what. And same with [the father].
>
> Q. It's your understanding that was his verbal agreement as well? A. Yes.

The father testified at the termination hearing that his understanding was the guardian would get in touch with him when it was convenient for her to have the father visit. The guardian, however, testified that she did not recall any such

agreements. When asked on cross examination about a verbal agreement with the parents regarding ongoing contact, she testified that "[t]here wasn't really any, other than when we brought the boys back [from Florida], [the mother] said she was going to stay a couple days and she was going to leave, and she probably wouldn't see the boys for a long time."

After the guardianship was established in May 2011, the guardian and the mother travelled to Florida to retrieve the children. According to the guardian, the boys had taken to calling their temporary Florida caretakers "mom" and "dad" in the intervening months, and the mother introduced the guardian to the children by telling her sons "this is your new mommy." Approximately six months later, the guardian moved the children and the rest of her household to a new address without informing the parents. She had unilaterally determined that severing the face-to-face relationship between the parents and their sons was in the children's best interests. By February 2012, the guardian had formed an opinion that the mother should not have a continuing relationship with T.B. and M.C. She admitted this on cross examination at the contested termination hearing:

> Q. It was your testimony earlier that it was [the mother] and [father]'s idea to give you the children? A. Yes.
> Q. And it's also true it was your idea for the guardianship? A. All three of ours.
> Q. Who was the one that suggested the guardianship? A. [The father.]
> Q. And you testified there was really no verbal agreement about visitation or support? A. No.
> Q. Was it your understanding that the guardianship would be temporary? A. Until he [sic] got on her feet and she could take care of them.
> Q. Did [the mother] ever visit the children while they were in your care? A. In the beginning.
> Q. And in the beginning you lived [in Des Moines]? A. Yes.

Q. And then around about October of 2011, you moved to [a different Des Moines address]? A. Yes.

Q. Did you ever inform [the mother] or [the father] of your move? A. No.

Q. And since the time that you moved . . .], is it your testimony that [the mother] has never contacted you? A. No, she has.

Q. During those conversations with [the mother], did you ever inform her that you moved . . . ? A. No.

Q. And during those conversations, did [the mother] ask to see [T.B.] and [M.C.]? A. Yes.

Q. And during those conversations, did [the mother] ask to speak with [T.B.] and [M.C.]? A. Yes, and she did.

Q. And so you were aware the [the mother] wanted to have contact and visitation with [T.B.] and [M.C.]? A. Yes.

Q. You've already testified that you believe it's in the best interest that [the mother] does not have contact with [T.B.] and [M.C.]? A. Yes.

The guardian explained she believed she should deny visitation to parents and to request to terminate the parents' parental rights by claiming that they had abandoned their children:

I can tell you my definition. When you're a guardian, you are to protect those children. And so that's what I feel that I'm doing. I'm trying to protect them for they don't go through anymore abuse or neglect or nothing. They need allowed to be themselves.

The guardian's intentions prevailed. Her actions placed the father and mother in a position where being a part of their children's lives would require serious effort, and neither parent was willing to make the required effort. The father has not seen his son since very early in the guardianship. He testified that he saw T.B. on several different occasions—at a birthday party, at a church service, and at a friend's home—but has not had any contact with him since. He testified he believed that those types of visits would continue, and hoped that they would, but he relied entirely on the guardian to invite him to visit his son and would accept her offers. When she failed to do so, he did not follow up. The

father has not initiated contact with T.B. and—as of the date of the termination hearing—had not called the guardian for an update on his son for at least six months. The father has not tried to send gifts, cards, or other items directly to T.B. From the outset of the guardianship until September of 2013, he made no financial contribution for his son's care. He has been paying child support to the guardian since September 2013 out of his wages as a full-time employee at a fast-food restaurant.[2]

The mother made more of an effort than the father. She testified that at the outset of the guardianship, she called her sons every night and visited about two to three times a week. This contact continued until M.C.'s first day of preschool in August 2011 when the mother accompanied the guardian to M.C.'s first day of school and became emotional. The mother testified that she began crying, which caused M.C. to cry, and the guardian chastised her afterwards for ruining the boy's day. The mother has not seen her sons since. Although she called to ask permission to visit, the guardian began to deny her requests citing the boys' busy schedules and a need to obtain prior approval from the boys' therapist.[3] Then, according to the mother, the guardian began not returning her phone calls in October 2011. She has not requested a visit since. The mother explained that around Christmas 2011 she became so frustrated she went to the guardian's address looking for her boys but only found an empty house (the

---

[2] The father's child support obligation is $245 a month, but he paid about $462 in 2013 and $2309 for eight months in 2014. The guardian testified she receives $232 a month in a disability check for the child. The record does not disclose whether the child support payments affect the amount of the disability check.

[3] The guardian disputes many of these calls, and that the mother called as often or as recently as she claims.

guardian had moved). The mother described driving around that night trying to find the guardian's car. The mother was unsuccessful, and in fact did not learn where the guardian moved until a friend told her in the spring of 2013. There is no evidence of efforts by the mother to contact the guardian or the children in 2012, with the exception of the mother's application to terminate the guardianship that year. It is not disputed, however, the mother always had a current phone number for the guardian.

The mother testified she made about thirteen calls to the guardian during 2013, but never spoke to her. She made no calls during 2014. The mother has not provided any financial support for her boys since they have been in care of the guardian. She testified she did offer to do so but was rebuffed by the guardian. The mother also testified she has not sent her children gifts, cards, or other items because she believed they would be rejected by the guardian and not given to T.B. and M.C.

The mother tried to terminate the guardianship on two separate occasions. She first attempted to do so in 2012, but withdrew her application when she was incarcerated on a charge of assault causing bodily injury towards a mentally ill person. The mentally ill person was the mother's boyfriend at the time. The court suspended the mother's sentence and placed her on probation. The mother then attempted to terminate the guardianship in 2013, after completing her probation. She began communicating with the children's therapist as a result of that application. By then, both children were under the care of a therapist who told the mother "it was going to take a process" to reestablish contact with her children. The mother met with the therapist once in person, spoke with her twice

on the phone, and then gave up and did not contact the therapist again. She never progressed enough to see her children in the presence of the therapist. The mother did not follow through with her application, and moved to Arkansas for four months "to take a little vacation and also visit some of [her] friends."

A number of other issues warrant mention because they affect the relationships of the various parties to this appeal and our ultimate analysis of what will be in the best interest of T.B. and M.C. going forward. To begin with, both children have special needs related to mental health issues: mild intellectual disability, autism spectrum disorder, attention deficit hyperactivity disorder (ADHD), anxiety disorder, and mixed expressive/receptive language disorder. Both boys receive services through various programs and physicians, and also receive special programming at school. Both also displayed significant developmental delays at the beginning of the guardianship. The father and the mother are generally unaware of the specifics of their children's special needs, except for information obtained through the guardian. The mother testified she told the guardian she suspected M.C. had ADHD, and T.B. was "a little bit slower," but otherwise had no concrete information of her own. Both the father and the mother concede that the guardian has provided proper care to both T.B. and M.C. relative to their special needs.

The father and mother also have personal issues that have bearing on this appeal. The father was convicted of a sex offense in 1997, when he was fourteen years old, and must register as a sex offender for life. He failed to register and spent seventeen months at a residential correctional facility from early 2013 through April 2014. Upon his release, he had a difficult time finding

housing that meets the residency restrictions placed upon him as a result of his conviction. As mentioned previously, the father had another son with special needs adopted by the guardian with the father's consent.

The mother has significant mental health issues and has been diagnosed with posttraumatic stress disorder, bipolar disorder, and borderline personality disorder. The mother attempted suicide in August 2011 when she jumped off a bridge following a negative conversation with the guardian.[4] In 2012, she engaged in treatment as a condition of her probation for the assault against her mentally ill boyfriend. The mother admits to having used illegal substances in the past, although she says she has not done so since 2006. She has two children older than T.B. and M.C. who were adopted with her consent. She testified the purpose of the adoption of those children was to protect them from their abusive father (who is not the father in this case). The mother also has a daughter younger than T.B. and M.C. who still lives with her. The mother has lived in eight different residences since the guardianship began, and has had three different phone numbers during that same time period. At the time of the termination hearing, she admitted that the guardian did not have her most current number.

The guardian was sixty years old at the time of the termination hearing. At one point in time, she was caring for six children, including T.B. and M.C. She currently receives disability payments for three children: T.B., M.C., and T.B.'s half-brother. She also receives disability income for her own fibromyalgia. She

---

[4] The mother disputes the contention that she was trying to commit suicide. At the termination hearing, she testified: "I was trying to find my source of security, which is water, and I jumped in. I could have chose[n] to do it in a pool, but I didn't." She did concede that "[s]ince it was the river, it's considered a serious thing."

has been receiving her payments since she was fifty-two years old, when the pain associated with her disability forced her to cease her work as a certified nursing assistant caring for the elderly. She testified if she became unable to care for the children, responsibility for the care of T.B. and M.C. would fall to her daughter and her daughter's boyfriend. The guardian's daughter is permanently disabled and confined to a wheelchair. The guardian has other programs and providers in place which she expects to work with the children into their adulthood.

On May 14, 2014 the guardian filed petitions for termination of the parental rights of both the father and mother as a step toward adoption of T.B. and M.C. A guardian ad litem was appointed for T.B., and she filed a report supporting termination of the parental rights of both parents. A contested termination hearing was held on October 30, 2014. The district court issued a ruling on November 21, 2014, terminating the parental rights of both the father and mother as to T.B. and of the mother and any putative father as to M.C. The district court found that both parents had abandoned their children pursuant to Iowa Code chapter 600A (2013), and that termination was in the best interests of the children. Both the father and the mother appeal that ruling.

## II. Standard of Review

We review termination proceedings brought pursuant to Iowa Code chapter 600A de novo. *See In re C.A.V.*, 787 N.W.2d 96, 99 (Iowa Ct. App. 2010). We are not bound by the district court's factual findings, but we do afford them weight, particularly findings regarding witness credibility. *Id.* Our primary concern is the best interests of the children involved. Iowa Code § 600A.1 ("The

best interest of the child subject to the proceedings of this chapter shall be the paramount consideration in interpreting this chapter."); *see also C.A.V.*, 787 N.W.2d at 99.

### III. Analysis

In a private termination proceeding, the petitioner must establish by clear and convincing evidence the statutory ground or grounds authorizing the termination of parental rights. *See* Iowa Code § 600A.8; *In re R.K.B.*, 572 N.W.2d 600, 601–02 (Iowa 1998). In addition, after proving the statutory ground or grounds, the petitioner must also prove that termination of parental rights is in the best interest of the child. *See* Iowa Code § 600A.1; *R.K.B.*, 572 N.W.2d at 602. While the best interests of the child is the primary concern of the termination proceeding, the interests of the parents must also be given due consideration. *See* Iowa Code § 600A.1; *R.K.B.*, 572 N.W.2d at 601.

Abandonment of a minor child is one statutory ground for termination of parental rights authorized by chapter 600A. *See* Iowa Code § 600A.8(3). Chapter 600A defines abandonment of a minor child as "reject[ing] the duties imposed by the parent-child relationship . . . , which may be evinced by the person, while being able to do so, making no provision or making only a marginal effort to provide for the support of the child or to communicate with the child." *Id.* § 600A.2(19). More specifically, chapter 600A states that "a parent is deemed to have abandoned a child as follows":

> If the child is six months of age or older when the termination hearing is held, a parent is deemed to have abandoned the child unless the parent maintains substantial and continuous or repeated contact with the child as demonstrated by contribution toward

support of the child of a reasonable amount, according to the parent's means, and as demonstrated by any of the following:

(1) Visiting the child at least monthly when physically and financially able to do so and when not prevented from doing so by the person having lawful custody of the child.

(2) Regular communication with the child or with the person having the care or custody of the child, when physically and financially unable to visit the child or when prevented from visiting the child by the person having lawful custody of the child.

(3) Openly living with the child for a period of six months within the one-year period immediately preceding the termination of parental rights hearing and during that period openly holding himself or herself out to be the parent of the child.

Id. § 600A.8(3)(b). The petitioner need not establish the parent's subjective intent to abandon the child, and a subjective intent by the parent to maintain the parent-child relationship unsupported by the acts specified above will not preclude a determination that the parent has abandoned the child. *Id.* § 600A.8(3)(c); *see also In re G.A.,* 826 N.W.2d 125, 130–31 (Iowa Ct. App. 2012) (recognizing that a parent's subjective intent does not preclude a finding of abandonment). Furthermore, a showing of abandonment does not require total desertion; feeble contacts can also demonstrate abandonment. *In re M.M.S.,* 502 N.W. 2d 4, 7 (Iowa 1993).

Most relevant here, section 600A.8(3)(b) states that a parent not living with a child is still required to demonstrate a requisite level of contact with the child, and sets forth two alternative means of doing so. *See G.A.,* 826 N.W.2d at 130. First, the parent must visit the child at least monthly when physically and financially able, and when not prevented from doing so by the child's custodian. *Id.* Alternatively, when either physically or financially unable, or when prevented from doing so by the child's custodian, the parent must still maintain regular communication with either the child or the person having the care or custody of

the child. *Id.* Finally, in making a determination regarding abandonment of a child, a court "shall not require a showing of diligent efforts by any person to encourage the parent" to maintain regular contact. Iowa Code § 600A.8(3)(c).

We find that the guardian proved by clear and convincing evidence that both the mother and the father abandoned their children within the meaning of section 600A.8(3)(b). For while section 600A.8(3)(b) does expressly consider the possibility that a parent may be prevented from having visitation with his or her child, the voluntary failure of a parent to maintain regular communication can nevertheless justify termination. *See In re A.A.M.*, No. 13-0627, 2014 WL 3928877, at *2 (Iowa Ct. App. Aug. 13, 2014) (finding that a mother's lack of contact with child for sixteen months and lack of contact with custodial father for twelve months prior to termination hearing was "a marginal effort, at best, to maintain regular communication" and justified termination, even assuming that father had prevented her from having visitation with child). Since at least October 2011, neither parent has visited T.B. or M.C., and even if we assume that their interest in visitation was frustrated by the guardian's actions, both the father and mother fail to satisfy the alternative means of regular communication with either the children or the children's guardian.

The father admits he has only sporadically communicated with the guardian and never with his son. His most significant recent involvement in his son's life are the support payments he has been making since September 2013. As of the date of the termination hearing, the father had gone six months without speaking with either T.B. or the guardian. While marginally better, the mother admits that for the entire year of 2013, she attempted only thirteen phone calls to

the guardian about her sons, and made no such attempts at all during 2014. Whatever fault may lie with the guardian for creating distance between the father and mother and their children, the parents must still make efforts at regular contact of some kind or can be found to have abandoned their children in the eyes of the law. The marginal attempts at contact made by the parents since 2011 are not sufficient.

It is true that our supreme court has opined the legislature intended that abandonment of a child "must not be a situation where the parent has merely turned to a particular person for help in caring for the child in a time of need." *In re Goettsche*, 311 N.W.2d 104, 106 (Iowa 1981). But, in *Goettsche*, the court ultimately held that by leaving his children with his ex-wife and failing to maintain meaningful communication with them, the father had not only relinquished his parental rights and privileges but also abdicated parental duties. *Id.* at 107. Here, the record shows the father and mother followed a similar path: they initially agreed to a guardianship in their children's best interest but then entirely failed to act as parents to their children once they were in the care of another person.

This brings us to the question of whether termination of the father and mother's parental rights is in the children's best interests. The district court believed the guardian's account of the parties' understanding of the guardianship, and we do afford that credibility determination weight. Both the father and the mother admitted at the termination hearing that they believe the guardian has provided adequate care for their children. Given the boys' special needs, adequate care is no small feat. Moreover, the guardian has experience

dealing with T.B. and M.C.'s special needs and a plan going forward as the boys age. This is more than can be said of the father and mother, who still have only a rudimentary understanding of the myriad issues that the coming years will bring. The boys are currently living together in a stable environment, and have come to think of the guardian as their mother.

We assess the best interests of T.B. and M.C. under the definition provided in Iowa Code section 600A.1:

> The best interest of a child requires that each biological parent affirmatively assume the duties encompassed by the role of being a parent. In determining whether a parent has affirmatively assumed the duties of a parent, the court shall consider, but is not limited to consideration of, the fulfillment of financial obligations, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life.

The record demonstrates that both the father and the mother have failed to affirmatively assume the duties encompassed by the role of being a parent. The guardian has taken her role as guardian of T.B. and M.C. more seriously than the father and mother have taken their role as the boys' parents. We uphold the district court's termination of the father and the mother's parental rights to T.B. and M.C. so that the guardian may move forward with her planned adoption of the two boys. They deserve permanency and stability, and the care of someone upon whom they can consistently and reliably depend.

**AFFIRMED ON BOTH APPEALS.**