# IN THE COURT OF APPEALS OF IOWA

No. 16-0968
Filed November 23, 2016

**IN THE INTEREST OF B.R.,**
**Minor child,**

**N.R., Father,**
    Petitioner-Appellant,

**L.P., Mother,**
    Respondent-Appellee.
_____


Appeal from the Iowa District Court for Franklin County, Peter B. Newell, District Associate Judge.


A father appeals the district court's denial of his petition to terminate the mother's parental rights. **REVERSED.**


Megan R. Rosenberg of Cady & Rosenberg Law Firm, P.L.C., Hampton, for appellant father.

Barbara J. Westphal, Belmond, for appellee mother.


Considered by Potterfield, P.J., and Doyle and Tabor, JJ.

**DOYLE, Judge.**

In this appeal, we must determine whether the evidence supports terminating a mother's parental rights pursuant to Iowa Code chapter 600A (2015). The juvenile court found the father failed to meet his burden of proving by clear and convincing evidence that the mother abandoned the child. On our de novo review, we find the evidence shows abandonment; accordingly, we reverse.

## I. Background Facts and Proceedings.

The mother and father of B.R., born in 2007, have never been married. Although the mother consistently denied the father's paternity, the father obtained DNA testing that determined he was B.R.'s father. In April 2008, the father obtained an order for custody and visitation, which granted him visitation with B.R. on alternating weekends and one night per week. In 2010, the father received additional visitation with B.R. during the summer months.

The father provided more care for B.R. than was set forth in the April 2008 order. The father agreed to begin visits early or to care for B.R. additional days at the mother's request. On one occasion, the father cared for B.R. for three weeks due to concerns about the mother's mental health. After becoming increasingly concerned about the mother's mental health, substance abuse addiction, and ability to care for B.R., the father asked the mother to grant him physical care of the child. The mother acquiesced in January 2012 with the agreement that the father would continue paying her $200 per month.[1] The

---

[1] This amount represents a portion of the money the father paid the mother in child support. The father agreed that he would continue to pay the mother his amount and the

stipulated decree provided the father physical care of B.R. with the mother receiving visitation on alternating weekends.

Shortly after the transfer of custody, the father's concerns about the mother's ability to care for B.R. proved justified. Drugs, drug paraphernalia, and loaded guns were discovered during an April 2012 search of home the mother shared with her boyfriend, and the couple's nine-month-old child—B.R.'s half-sibling—tested positive for methamphetamine. The State removed the half-sibling from the home and adjudicated the child to be a child in need of assistance, which eventually led to termination of the mother's parental rights to that child in March 2013.

As a result of the April 2012 search, the Iowa Department of Human Services (DHS) found the mother denied B.R. critical care by using drugs during visits, and it enacted a safety plan prohibiting the mother from having unsupervised visits with B.R. The father and his wife of five years, B.R.'s stepmother, signed the safety plan, agreeing to supervise the mother's visits. Although they offered her three-hour visits on alternating weekends, the mother exercised very little of that visitation, attending only eleven visits in 2012, nine in 2013, twelve in 2014, and seven in 2015. She skipped visits in some months in 2012, had a six-month gap of no visits between 2013 and 2014, failed to visit B.R. for four months in 2014, and went six months without visiting B.R. in 2015. Often, the mother failed to provide notice she would not be attending the scheduled visits.

mother would not be required to pay child support even though B.R. was in the father's care.

When the mother did attend visits with B.R., the visits did not last longer than one hour. Over time, B.R. became increasingly resistant to attending visits and refused to interact with the mother during them. The mother would become angry during visits because of B.R.'s apparent disinterest, and she would yell at the father and call him names. On one occasion, the father had to call law enforcement to intervene.

The mother was arrested three times in 2015 and was incarcerated in October 2015 as the result of a probation violation. She served part of her sentence in jail and the remainder at a residential facility. During that period, she began writing B.R. a letter each week.

The father filed a petition to terminate the mother's parental rights in February 2016. The guardian ad litem appointed to represent B.R.'s interests recommended the court terminate the mother's parental rights. The termination hearing was held in April 2016, two weeks after the mother was discharged from probation. The mother visited B.R. two days before the hearing.

In May 2016, the juvenile court entered its order denying the father's petition to terminate the mother's parental rights on abandonment grounds. The court concluded the mother had "failed to fulfill her duties" to B.R. because she "spent years abusing controlled substances, missing [B.R.]'s birthday, committing crimes, and being incarcerated," failed to meet B.R.'s day-to-day needs, and had been physically, emotionally, and financially unavailable to the child. The court concluded that it would have been appropriate to find the mother abandoned B.R. "at several times during their relationship." However, it declined to find the mother had abandoned B.R. at the time of the termination hearing because she

"is currently involved in substance abuse and mental health treatment" and "is making diligent efforts to communicate with" B.R.  Rather, the court faulted B.R. for being "unwilling" to have a relationship with the mother.  It concluded by stating:

> The mother has demonstrated a commitment to this child by continuing to make herself available for the child's disdainful conduct.  Despite the humiliation she must experience of being snubbed by a nine-year-old, she continues to make it apparent to this child, through her behavior, that she is available to have a relationship with him.  It does not appear to the court that the mother can do anything beyond what she is currently doing.

Because it concluded the father failed to establish by clear and convincing evidence the grounds for terminating the mother's parental rights, the juvenile court dismissed the father's petition.  The father appeals.

## II. Standard of Review.

We review termination proceedings brought pursuant to Iowa Code chapter 600A de novo.  *See In re C.A.V.*, 787 N.W.2d 96, 99 (Iowa Ct. App. 2010).  The district court's factual findings are not binding on us, but we afford them weight, particularly with regard to witness credibility.  *See id.*

## III. Termination of Parental Rights.

In a private termination-of-parental-rights proceeding, the petitioner must establish by clear and convincing evidence that a statutory ground for termination exists.  *See* Iowa Code § 600A.8; *In re A.H.B.*, 791 N.W.2d 687, 691 (Iowa 2010).  If a ground is proved, the petitioner must also establish termination of parental rights is in the child's best interests.  *See A.H.B.*, 791 N.W.2d at 690. Although the interests of the parents must be given due consideration, our primary concern is the child's best interests.  *See* Iowa Code § 600A.1 ("The best

interest of the child subject to the proceedings of this chapter shall be the paramount consideration in interpreting this chapter."); *A.H.B.*, 791 N.W.2d at 690-91.

### A. Statutory Ground For Termination.

Abandonment of a minor child is one of the grounds authorizing the termination of parental rights under Iowa Code chapter 600A. *See* Iowa Code § 600A.8(3). The petitioner need not establish the mother's subjective intent to abandon the child. *See id.* § 600A.8(3)(c); *In re G.A.*, 826 N.W.2d 125, 130 (Iowa Ct. App. 2012) (recognizing a parent's subjective intent does not preclude a finding of abandonment); *see also In re C.J.F.M.*, No. 10-0166, 2010 WL 3157756, at *2 (Iowa Ct. App. Aug. 11, 2010) (recognizing the "'intention to abandon' is no longer a statutory element in the definitions of Iowa Code chapter 600A"). Nor is he required to show he or anyone else made diligent efforts to encourage the mother to perform the acts specified in section 600A.8(3)(b). *See* Iowa Code § 600A.8(3)(c). Rather, abandonment is determined by a parent's actions or lack thereof. *See In re J.L.W.*, 523 N.W.2d 622, 624 (Iowa Ct. App. 1994) ("Clearly, actions speak louder than words. Intent can be shown through conduct."). Section 600A.2(19) defines abandonment of a minor child as "reject[ing] the duties imposed by the parent-child relationship . . . , which may be evinced by the person, while being able to do so, making no provision or making only a marginal effort to provide for the support of the child or to communicate with the child."

Iowa Code section 600A.8(3)(b) provides that a parent of a child six months old or older will be deemed to have abandoned the child if that parent

failed to maintain "substantial and continuous or repeated contact with the child as demonstrated by contribution toward support of the child of a reasonable amount, according to the parent's means." Iowa Code § 600A.8(3)(b). Here, the mother has failed to provide any financial support for B.R. since custody was transferred to the father in 2012. Although the mother was not required to pay child support under the terms of the custody and visitation order, "section 600A.8(3)(b) is not limited to court-ordered support payments." *In re W.W.*, 826 N.W.2d 706, 710 (Iowa 2012); *see also* Iowa Code § 600A.8(4) (providing a separate ground for terminating parental rights where a parent has been ordered to contribute to the child's support and has failed to do so without good cause). The mother justifies her lack of support by claiming she asked the father what B.R. needed and the father told her "nothing." She did provide gifts for B.R. on occasion, although B.R. rejected them.

Even assuming the mother's failure to support B.R. is insufficient to establish abandonment, the father has provided ample evidence the mother abandoned B.R. under the second provision of section 600A.8(3)(b). That provision states that a parent of a child age six months or older will be deemed to have abandoned the child unless the parent engages in one of the following:

> (1) Visiting the child at least monthly when physically and financially able to do so and when not prevented from doing so by the person having lawful custody of the child.
> (2) Regular communication with the child or with the person having the care or custody of the child, when physically and financially unable to visit the child or when prevented from visiting the child by the person having lawful custody of the child.
> (3) Openly living with the child for a period of six months within the one-year period immediately preceding the termination of parental rights hearing and during that period openly holding himself or herself out to be the parent of the child.

Iowa Code § 600A.8(3)(b). There is no dispute that criteria set forth in subparagraph (3) has not been met as B.R. has lived with the father since 2012. The mother did not meet the criteria set forth in subparagraph (1) because she failed to visit B.R. on a monthly basis during any year in which B.R. was in the father's custody.[2] Although the father set the time and place for visits, as was necessary given the DHS requirement that visitation be supervised, there is no indication that he acted unreasonably in doing so. *See In re G.A.*, 826 N.W.2d 125, 129 (Iowa Ct. App. 2012) (finding the mother did not prevent the father from exercising visitation with the child where the mother placed reasonable conditions on visitation in light of the father's substance-abuse history and noting the father made no attempt to comply with the conditions). Rather, the father chose a time for visits based on B.R.'s schedule. If the mother was unable to attend visits during those times, she could have stated as much. Instead, she often cancelled visits at the last minute—or, worse, she simply failed to attend without explanation.

The evidence shows the mother also failed to remain in regular communication with the child or the father, as required by subparagraph (2) of section 600A.8(3)(b). Although the mother claims the father failed to return her calls and messages "several times," the evidence indicates the communication issues were a result of the mother's lifestyle. The mother stayed at a number of

---

[2] To the extent that the mother was unable to visit the child while incarcerated, we note incarceration does not justify this failure. *See In re M.M.S.*, 502 N.W.2d 4, 8 (Iowa 1993) (holding a parent "cannot use . . . incarceration as a justification for [a] lack of relationship with the child," especially "when the incarceration results from a lifestyle that is chosen in preference to, and at the expense of, a relationship with a child").

locations over the years and provided the father as many as "20 to 30" different phone numbers. At trial, the stepmother explained why it was "impossible" for her or the father to return the mother's phone calls:

> If she even left a message, there was no indicator that [we were] allowed to call back that number.
> . . . Sometimes it would be a hotel number that we could actually call back. Sometimes some random person—male or female—would answer and [say the mother] wasn't there and "don't call this number back again." Sometimes the number would be already disconnected. Sometimes when I called back, they would say: "We don't know who that is; don't call this number again." There was never a set number to call her back on.

Moreover, in a deposition taken six weeks before the termination hearing, the mother never mentioned any difficulty in communicating with the father. Instead, she twice admitted that the father and stepmother had done everything they could to facilitate her relationship with B.R. The mother did begin writing B.R. letters while she was incarcerated, but this attempt at communication in the months leading up to termination after years of absence from the B.R.'s life was simply "too little, too late." *See M.M.S.*, 502 N.W.2d at 8 (noting a parent's "feeble contacts" with the child "must be viewed in the light that total desertion is not required for a showing of abandonment"). The father has met his burden of showing by clear and convincing evidence that the mother abandoned B.R. pursuant to section 600A.8(3)(b).

**B. Best Interests of the Child.**

Turning to the "best interests" question, the evidence clearly shows B.R.'s best interests are served by terminating the mother's parental rights. The mother used drugs while B.R. was in her care and exposed B.R. to domestic abuse. The evidence shows B.R. was "deeply" affected by the step-sibling testing positive for

methamphetamine and talked "a lot" with a therapist about the violence witnessed in the mother's home. B.R. felt unsafe due to the mother's actions while B.R. was in her care, as well as her behavior during supervised visits. Despite having her parental rights to one child terminated three years earlier, the mother has yet to demonstrate she has adequately addressed her mental-health and substance-abuse issues or that she can remain sober. She was arrested three times in the year preceding the termination hearing, and her longest period of sobriety was a result of her incarceration.

In contrast, the father and stepmother have provided B.R. with a safe and nurturing home. B.R. has been vocal about wanting to be adopted by the stepmother, who B.R. considers to be "mom." The father and stepmother have also provided visits between B.R. and B.R.'s half-sibling on at least a monthly basis, allowing the children to continue their sibling relationship.

B.R. is now nine years old. After five turbulent years in the mother's care, B.R. has been able to experience four years in a safe and stable home life with the father and stepmother. Meanwhile, the mother has continued to demonstrate her inability to put B.R.'s needs ahead of her own by continuing to engage in a lifestyle marred by substance abuse, domestic violence, and criminal activity. As a result, the mother failed to attend the majority of the visits with B.R. that were available to her, which further communicated to B.R. her indifference toward parenting. Although B.R.'s response to the mother on those occasions when she did present herself for visitation is hardly surprising, the juvenile court criticized the father and stepmother for failing to teach B.R. "compassion or understanding" toward the mother's feelings. Much more egregious is the mother's failure to

show compassion or understanding of her child's feelings in light of her continuous failure to fulfill her parental duties. Rather than demonstrating patience and understanding about B.R.'s reticence to be near her when she had not yet proved herself as a parent, the mother reacted in frustration, displaying anger, calling the father names, and making threats. This behavior was likely reminiscent of what B.R. experienced while in her care, further demonstrating the mother had made no tangible change in her lifestyle or improvement in her parenting ability. It is not a mystery, then, that this child would vocalize a desire for the same outcome as a step-sibling who experienced the same trauma and was removed from the mother's care, placed in a safe home, and adopted— ensuring the mother could never threaten that child's safety again. The only difference between these half-siblings is that B.R.'s father took action to protect B.R. before the DHS had to, which negated the need for the State to initiate child in need of assistance proceedings under chapter 232 with regard to B.R. It is in B.R.'s best interests to terminate the mother's parental rights. Accordingly, we reverse the district court's order dismissing the father's petition.

**REVERSED.**