**IN THE COURT OF APPEALS OF IOWA**

No. 21-1744
Filed June 15, 2022

**IN THE INTEREST OF R.G.,**
**Minor Child,**

**L.G., Mother,**
　　　Petitioner-Appellee,

**T.B., Father,**
　　　Respondent-Appellant.
_____

　　　Appeal from the Iowa District Court for Dallas County, Virginia Cobb, District

Associate Judge.


　　　A father appeals the termination of his parental rights under Iowa Code

chapter 600A (2020). **REVERSED AND REMANDED.**


　　　Teresa Pope of Branstad & Olson Law Office, Des Moines, for appellant

father.

　　　Elizabeth Kellner-Nelson of Kellner-Nelson Law Firm, P.C., West Des

Moines, for appellee mother.

　　　Sarah E. Dewein of Cunningham & Kelso P.L.L.C., Urbandale, attorney and

guardian ad litem for minor child.


　　　Considered by Vaitheswaran, P.J., and Tabor and Badding, JJ.

**TABOR, Judge.**

A father, Thomas, appeals the termination of his parental rights under Iowa Code section 600A.8 (2020). He contends that he did not abandon his daughter, R.G., and that termination was not in her best interests. Because R.G.'s mother, Lindsay, failed to offer clear and convincing evidence of abandonment, we reverse the termination.[1]

## I. Facts and Prior Proceedings

Thomas and Lindsay ended their romantic relationship while she was still pregnant with R.G. Despite their split, for the next four years, Thomas expressed a desire to be a part of R.G.'s life. The key question is whether his actions manifested that subjective desire to be a parent.

From the beginning, Thomas was "ecstatic" about the prospect of being a father and made clear when Lindsay told him about the pregnancy that he wanted to be involved in the child's life. As proof, he attended a prenatal appointment with Lindsay. But after Thomas made "inappropriate comments" as she undressed, Lindsay disinvited him from future appointments. Despite no longer being welcome, Thomas persisted in asking to be included, noting "how important" these appointments were to him. Lindsay responded: "It sucks for you, I get it." But she insisted it was too stressful to have him attend the appointments.

Beyond appointment information, Lindsay was reluctant to share other details of the pregnancy with Thomas. For instance, she only showed him an

---

[1] We review chapter 600A terminations de novo. *In re C.A.V.*, 787 N.W.2d 96, 99 (Iowa Ct. App. 2010). We give weight to the district court's factual findings, particularly on credibility issues, but we are not bound by them. *Id.* Our primary concern is the child's best interests. *Id.*

ultrasound photograph after he requested that they be "civil" and try co-parenting before the baby was born. Similarly, during the termination hearing, Thomas testified that he learned the baby's sex second-hand from his mother and sister, as Lindsay had informed them before telling him.

When R.G. was born in August 2017, Thomas was incarcerated for a parole violation and incurred a new charge for being a felon in possession of a firearm. But even from jail, Thomas contacted Lindsay about the baby. That contact was unwelcome. He testified that Lindsay declined his calls because she did not like him "calling on the recorded line." Hitting a roadblock, he sent letters and cards. He also asked his mother and sister to communicate with Lindsay on his behalf. Finally, he tried setting up an in-person or virtual visit with the baby—something Lindsay would not allow.

Thomas was released from custody in May 2018. Soon after, he began visitation with R.G. At first, Lindsay required that visits be at her parents' home. But eventually Thomas progressed to overnight visits with R.G. Thursday became the designated visitation day. Granted, Thomas was inconsistent, often rescheduling or cancelling visits. That said, text messages between the parents show Thomas did step in when Lindsay needed someone to watch R.G. at the last minute.

For over a year, and despite Lindsay's frustrations, this aim-for-Thursday-but-proceed-ad-hoc arrangement continued. Then, in late July 2019, Thomas asked to curtail visits because he fell into a difficult emotional state after his girlfriend was unfaithful. As R.G.'s birthday approached a few weeks later, Thomas asked to "pick her up for a few hours." But Lindsay rejected his request,

stating she needed to "see consistency" from Thomas first. To that end, Lindsay limited visits to a two-hour session each Thursday. Again, Thomas often missed a set Thursday visit, seeking to make up for it another day.

Thomas's final in-person visit was in October 2019 when he took R.G. trick-or-treating. About a week later, Thomas arrived unexpectedly at Lindsay's home after police executed a search warrant at his residence. That raid led to Thomas returning to prison in January 2020. As during his prior incarceration, Thomas made phone calls, wrote letters, and asked his sister and mother to keep him updated on R.G. But again, Lindsay rebuffed his efforts. For example, she testified that she would "absolutely not" consider taking then two-year-old R.G. for a jail visit. And, in a similar vein, Lindsay rejected Thomas's phone calls, reasoning that she did not want R.G. to "get attached to a voice even" because he "would disappear again."

Come summer, Thomas was released again and asked to restart his visitations with R.G. Although Lindsay agreed, she required certain "stipulations." Among other things, Lindsay forbade Thomas from calling himself R.G.'s dad, noting: "If I do hear it, I will end the visit immediately." Text messages showed that Thomas did "accept and acknowledge" Lindsay's stipulations, saying: "I want to see my daughter." Yet Lindsay stalled. So from late July until mid-August, Thomas texted Lindsay daily, asking if he could see R.G.

As Thomas was requesting visitation, Lindsay petitioned for termination of his parental rights.[2] In September 2020, she agreed to allow visitations between

_____

[2] Although Lindsay petitioned in late July, Thomas was not served until August 15.

R.G. and Thomas, but on one condition: he had to submit a negative hair follicle drug test.[3]  In December, Thomas provided a negative urine analysis (UA).  But citing Thomas's history of using synthetic urine to avoid a positive test, Lindsay continued to deny visitation.  In January 2021, Thomas failed a saliva test, testing positive for methamphetamine, opioids, cocaine, and heroin.  As of the July 2021, termination hearing, Thomas had not provided the hair sample for testing and visitation had not resumed.

The district court terminated Thomas's parental rights on abandonment grounds, finding his drug-related incarcerations "rendered him functionally absent" from his daughter's life.  Thomas now appeals.

## II.  Analysis

Terminations under chapter 600A follow a two-step process.  *See In re B.H.A.*, 938 N.W.2d 227, 232 (Iowa 2020).  First, the petitioner must present clear and convincing evidence of a ground for termination.  *Id.*  Second, termination must be in the child's best interest.  *Id.*

The district court found that Lindsay offered clear and convincing evidence to prove Thomas abandoned R.G. under Iowa Code sections 600A.2(20) and 600A.8(3).[4]  Under that framework, abandoning a child means the parent "rejects the duties imposed by the parent-child relationship."  Iowa Code § 600A.2(20).  That rejection is proven if, while being able to do so, the parent makes "only a

---

[3] Because his attorney did not forward Lindsay's request to him, Thomas was unaware of her hair-follicle-test demand until December.

[4] In her petition, Lindsay also sought termination based on Thomas being behind in his child support payments.  *See* Iowa Code § 600A.8(4).  The court did not make a determination on this ground and Lindsay does not urge that alternative ground in her appellee's brief.  So it is not before us.

marginal effort to provide for the support of the child or to communicate with the child."  *Id.*  When, as here, the child is under six years old, "a parent is deemed to have abandoned" that child:

> unless the parent maintains substantial and continuous or repeated contact with the child as demonstrated by contribution toward support of the child of a reasonable amount, according to the parent's means,[5] and as demonstrated by any of the following:
>     (1) Visiting the child at least monthly when physically and financially able to do so and when not prevented from doing so by the person having lawful custody of the child.
>     (2) Regular communication with the child or with the person having the care or custody of the child, when physically and financially unable to visit the child or when prevented from visiting the child by the person having lawful custody of the child.[6]

*Id.* § 600A.8(3)(b).  A parent's subjective intent "unsupported by evidence of acts . . . manifesting such intent" does not prevent a finding of abandonment.  *Id.* § 600A.8(3)(c).

On appeal, Thomas does not contest that his contact with R.G. was inconsistent.  Instead, he argues that he made continued and repeated *attempts* at contact, and Lindsay frustrated these efforts by blocking his access to R.G.  Rebutting, Lindsay contends that Thomas "prioritize[d] drugs over R.G." and that her requests for drug testing were reasonable under the circumstances.  Lindsay

---

[5] As to financial support, the district court could "only find that [Thomas] 'helped out' with expenses" for R.G.  Noting that he was current on child support at the time of termination, Thomas challenges this "erroneous finding."  Because Lindsay makes no argument in response, we assume Thomas's contributions toward R.G.'s support were enough to prevent termination.  *See* Iowa R. App. P. 6.903(2)(g)(3) (discussing waiver).

[6] A third option is "[o]penly living with the child for a period of six months within the one-year period immediately preceding . . . ."  Iowa Code § 600A.8(3)(b)(3).  That alternative does not apply here.

also argues Thomas "has had three years to establish a relationship with R.G. and he has failed to do so."

After reviewing the record, we find Lindsay did not meet her burden to prove abandonment by clear and convincing evidence. True, Thomas has exercised poor judgment that has led to his incarceration and consequent separation from his daughter. And undeniably, Thomas has been inconsistent in his parenting. But that inconsistency did not rise to the level of abandonment. Rather, the record shows repeated actions by Thomas to visit and maintain regular communication with R.G. and her mother. For example, after his first release from prison in May 2018, Thomas began visitation with R.G. Although first supervised at Lindsay's parents, these visits progressed to overnights at Thomas's home. True, Thomas did not seize on every opportunity to spend time with R.G. But the record shows he was maintaining regular visitation.[7] *See id.* § 600A.8(3)(b)(1) (requiring "at least" monthly visitation)

Even when Thomas was incarcerated, he acted to remain part of R.G.'s life.[8] Thomas wrote letters, made phone calls, asked for visitation, and sought updates—either directly from Lindsay or indirectly from his mother and sister. Lindsay accepted some of these gestures. But she rejected others.

---

[7] In fact, Lindsay created a timeline of Thomas's interactions with R.G. From January 2019 to October 2019, Lindsay noted twenty-eight interactions between Thomas and R.G., with July being the only month with no visits.

Although Lindsay's timetable is missing May through December 2018, Lindsay notes that Thomas's "pattern was the same."

[8] Thomas's efforts differ from the father in *C.A.V.*, who failed to communicate with his daughter during the three years he spent behind bars despite letters from the mother inviting him to maintain a relationship with their child. 787 N.W.2d at 101.

On appeal, Lindsay contends that Thomas cannot use his incarceration to justify "his lack of a relationship" with his daughter. See *In re M.M.S.*, 502 N.W.2d 4, 8 (Iowa 1993) (noting the observation is "especially true" if incarceration stems from a lifestyle "chosen in preference to, and at the expense of" a parental relationship). But as Thomas makes clear in his brief, "[he] is not trying to use incarceration as an excuse for failure to maintain contact with R.G." To the contrary, he argues that because Lindsay spurned many of his attempts to visit or communicate with R.G., his incarceration should not be treated as proof of abandonment. *See In re K.R.L.*, No. 02-1586, 2003 WL 21244297, at *2 (Iowa Ct. App. May 29, 2003) (considering that mother "rebuffed" visitation opportunities when deciding that incarcerated father did not abandon child). Thomas makes the more persuasive point.

In *M.M.S.*, our supreme court did not "hold or suggest that termination is a necessary result of conviction of a crime and resulting imprisonment." 502 N.W.2d at 8. But in that case, the father, Brent, "chose to believe" the child was not his, and only the paternal grandparents tried to establish a relationship with the child while the father was incarcerated. *Id.* So the court decided Brent's "feeble contacts" with M.M.S. did not fend off a finding of abandonment. *Id.* Unlike Brent, Thomas has vigorously asserted his parental rights and acted on his desire to stay in contact with his daughter.

Finally, we consider the parties' stalemate on drug testing since Lindsay filed her termination petition. Lindsay expressed in a text message that, as of December 2020, Thomas was "literally the only person standing in the way" of visitation because he had not obtained the hair follicle test that she set as a

condition for him seeing R.G. By the time of the termination hearing—six months later—he still had not provided that test result. Lindsay argues that Thomas's refusal to take a drug test that he could not manipulate was proof of abandonment: "A healthy, sober parent would not hesitate to provide proof they are not using illegal substances if that's what they need to do to see their child."

We agree that in some cases it is "fair and reasonable" for the custodial parent to condition visitation on the other parent providing "some proof of being drug free." *See In re G.A.*, 826 N.W.2d 125, 129 (Iowa Ct. App. 2012). But Lindsay provides no authority suggesting the custodial parent may deny visitation based on the failure to obtain one particular drug test. Here, Thomas provided a negative UA and was making progress in his substance-abuse and mental-health therapy. Unlike the father in *G.A.*, Thomas took steps to reinitiate contact with R.G. and agreed to comply with many of Lindsay's "stipulations." Months later, Lindsay moved the goal post. She resisted Thomas's requests to reconnect with R.G., preventing him from visiting or having regular communication with their daughter.

Drug testing aside, the record shows Thomas's ongoing commitment to R.G. since the termination proceedings began. *See id.* at 127 (noting father made no "efforts to visit or communicate" and had almost no "overtures for contact" after mother imposed drug-testing requirement). As before, Thomas continued to send Lindsay text messages asking to see R.G. or for videos and photos of her. Meanwhile, both parties' attorneys worked toward a mutually agreeable visitation arrangement. But after a few months without progress, Thomas petitioned to

establish custody and visitation.[9]  And, finally, as the termination hearings neared, he once again began writing letters to R.G.[10]  In sum, we are unconvinced that Thomas's obstinacy on drug-testing cancels out years of continuous, even if imperfect, attempts to be part of R.G.'s life.  Even accepting that Lindsay's request for testing was reasonable, given the grander context, these last months were insufficient to support termination.

That said, we are mindful that Lindsay is trying to protect R.G. from "a drug entangled father."  See *K.R.L.*, 2003 WL 21244297, at *3.  And we do not doubt that she has R.G.'s best interests at heart.  But her actions have obstructed Thomas's ability to maintain a relationship with his child.  *See id.*  Likewise, Thomas could have done far more to be a better parent.  But given the actions he did take, we find his efforts were more than "marginal" and do not justify a finding of abandonment.  Because Lindsay did not prove a statutory ground for termination, we need not address the best-interests question.  *See In re W.N.*, No. 15-0176, 2015 WL 6087624, *3 (Iowa App. Ct. Oct. 14, 2015).

**REVERSED AND REMANDED.**

---

[9] Given the already-pending termination proceedings, the district court took no action on Thomas's petition.  Proceedings in the custody case are currently stayed pending outcome of this appeal.

[10] Lindsay moved during Thomas's second incarceration and did not provide him with her new address.  Without that address, Thomas never mailed the letters.  Still, he continued writing them, keeping "more or less a journal."  According to his testimony, Thomas hoped that "if the worst case happens here" the letters would one day show R.G. that "he loved [her], that he tried to at least stick around."