**IN THE COURT OF APPEALS OF IOWA**

No. 15-0469
Filed March 9, 2016

**IN THE INTEREST OF A.D.,**
**Minor Child,**

**J.W., Mother,**
    Appellant.

_____

Appeal from the Iowa District Court for Fayette County, Alan D. Allbee, Associate Juvenile Judge.

A mother appeals from the order terminating her parental rights.

**AFFIRMED.**

Cory R. Gonzales of Law Firm of Cory R. Gonzales P.L.L.C., Strawberry Point, for appellant mother.

Anthony J. Gericke of Gericke Law Office, Postville, for appellant father.

Thomas D. Katsumes, Elgin, guardian ad litem for minor child.

Considered by Vogel, P.J., Potterfield, J., and Mahan, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2015).

**MAHAN, Senior Judge.**

A mother appeals from the order terminating her parental rights to her three-year-old child pursuant to Iowa Code chapter 600A (2013), claiming there was not clear and convincing evidence she abandoned the child and termination was not in the child's best interests. We affirm the decision of the juvenile court terminating the mother's parental rights.

**I.      *Background Facts and Proceedings***

The mother and father are the parents of A.D., who was born in August 2012. For the first six months of A.D.'s life, the child lived with and was cared for by the mother and father in Wisconsin. In February 2013, the father went to jail,[1] and the mother and child had no place to live. The mother asked a friend to take the child, unannounced, to Josette's (the child's maternal grandmother) house. Josette was unable to care for the child so she contacted Timothy, the child's maternal grandfather. Timothy and his wife, Salenia, who live in Iowa, agreed to care for the child on a temporary basis until the mother could get on her feet.

The following day, the mother went to Josette's house. Josette told the mother she was unable to keep the child but that Timothy and Salenia could. Josette, a nurse, had obtained a "Voluntary Placement Agreement" from an individual in the local human services office. The agreement, which was signed by the mother, provided:

> Child's Full Name: [child's name]  DOB: XX-XX-12
> I am the parent with legal custody of the above-named child, and
> voluntarily agree to place the child with [Timothy[2]], my father

---

[1] The father was released from jail in June 2013.
[2] Sometime after the mother signed the voluntary placement agreement but before it was delivered to Timothy and Salenia, Salenia's name was written underneath Timothy's.

who resides at [Timothy's address in Iowa].
I am allowing my father to have physical custody and control of my child, exercise and perform all decision-making responsibilities for my child which include the following: all medical care (routine and extraordinary), dental care, educational care, and any other care that my child may need.
Parent Signature: [mother's signature]    Date: 3-07-13
Parent Name Printed: [mother's name]
Parent Address: [mother's address in Wisconsin]
Parent Phone Number: XXX-XXX-XXXX

The next day, Josette and Salenia met in La Crosse, Wisconsin—the halfway point between them—to exchange the child.[3]  The child had minimal supplies—a "handful" of diapers, a bottle, and a "half can of formula."  Because Timothy and Salenia's three children were older—ages eighteen, eleven, and seven—Salenia made arrangements to borrow or purchase the supplies needed to care for a six-month-old baby.  The child was not up-to-date on immunizations and, according to Salenia, was "[n]ot where she should have been" developmentally.

In April 2013, the mother came to Iowa to visit a cousin.  Salenia brought the child for a visit at the cousin's house.  Salenia allowed the mother to come home with her and the child.  The mother stayed overnight, and Timothy and Salenia encouraged her to stay and indicated they would assist her in obtaining employment and housing so the child could be returned to her care.  While there, the mother had some interaction with the child but "[s]lept a lot."  The mother asked if a male friend could stay with her at Timothy and Salenia's house.  Salenia "didn't feel comfortable with that," so the mother decided to go to a motel

---

Salenia denied writing her name; the juvenile court surmised Josette may have added Salenia's name.
[3] Timothy, an over-the-road truck driver, was working that weekend.

to stay with the friend. The mother said she would be back the next day; instead, she returned to Wisconsin with the friend.

In May 2013, Timothy and Salenia filed a petition for appointment of guardian (voluntary), after medical professionals questioned their ability to consent to medical services for the child. In June 2013, following a hearing, the district court entered an order naming Timothy and Salenia as the child's guardians. Although the parents were aware of the guardianship proceeding, they did not inquire about the status of the guardianship or seek to have it terminated.[4]

In June 2013, the father's mother, Patricia, contacted Timothy and Salenia and asked them to come to Chicago and take the mother back with them. Timothy and Salenia agreed and were en route to Chicago when the mother called and told them she was having second thoughts. The next day the mother confirmed she and the father had reconciled and she was staying in Chicago. Timothy and Salenia returned home. At various times when Timothy was on truck routes through Chicago for work he offered to pick up the mother or father and bring them to Iowa to see the child, but they declined.

In March 2014, Timothy and Salenia enlisted the help of an attorney to prepare consents to termination of parental rights and to adoption of child, which

---

[4] Although notice was provided to the parents at their last known addresses, as required by law, the parents later denied receiving notice in advance of the hearing. At trial, however, the father acknowledged he had received notice while he was in jail. Likewise, the mother testified the father told her he had received the guardianship notice.

On appeal, the mother challenges the guardianship on the grounds that it "was not properly obtained." The mother did not raise this issue before the juvenile court, and the court did not address it. "It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). This claim is not preserved for our review.

they sent to the mother and father. The parents refused to sign the consents; instead, the father requested he and the mother be given more time to stabilize their situation so they could provide care for the child. Timothy reluctantly agreed.

Six more months passed. Aside from a few heated telephone calls from the father to Timothy, the parents had no contact with Timothy and Salenia. The parents did not ask about the child or request to visit the child. At one point Timothy expressed concern to the father at the costs associated with supporting the child; the father told Timothy "he would pay [them] back." At no time did the mother and father provide any financial support for the child, and they never sent any cards or presents or other supplies.

In September 2014, Timothy and Salenia filed a petition seeking to terminate the parents' parental rights under Iowa Code chapter 600A. The petition stated Timothy and Salenia were the child's guardians and alleged the mother and father had abandoned the child pursuant to Iowa Code section 600A.8(3)(b). The parents were appointed counsel.

In December 2014, the mother, through her attorney, filed a revocation of voluntary placement agreement, stating the voluntary placement agreement executed by the mother on March 7, 2013, "is hereby revoked, rescinded, cancelled, terminated, and voided in full, effective immediately," and stating the mother "demands immediate return of physical custody and control of the child." The child remained in Timothy and Salenia's care, as they believed they had a valid guardianship over the child.

A termination hearing was held on February 13, 2015. The court heard testimony from the mother and father, who were both represented by their respective counsels. The mother testified she had only intended for the voluntary placement to be temporary "because [she] couldn't take care of [A.D.] right at the time" and she "knew [Timothy] could do it." The mother testified she had intended to "get [A.D.] back" someday.[5] The mother testified she worked four hours per week cleaning a dentist office; she earned $50 per week. The mother testified she had not seen the child since April 2013, but she had contact several times on the phone and had "tried to Skype and Facebook." The mother testified she was now able to care for the child and asked the court "[t]o give [the child] back."

The father testified he had never visited A.D. because he did not "have the means to do it," but that he and the mother "were working things out." The father testified they lived with his mother, Patricia, in her home, along with another child of the father's and another child of the mother and father (born in June 2014). He stated Patricia had a debilitating illness and required constant care. The father was unemployed. When asked how he anticipated providing support for the child, the father testified his mother was going to leave her house to him "in [her] will," and stated that he and the mother would "both be working, eventually." The mother and father acknowledged they had not provided any financial support for the child since her placement with Timothy and Salenia.

---

[5] The mother also had an older child, I.S., born in 2011, who lived with the child's father in Wisconsin. The mother had not seen I.S. "in a year or so." Although she was obligated to pay $50 per month in support for I.S., the mother was substantially in arrears.

Timothy and Salenia also testified. They indicated the child was on track developmentally and was bonded to them and their other children. The child was up-to-date on immunizations and was integrated into the daycare she attended on days Salenia worked. They testified they were "attached" to A.D. and would adopt the child if they had the opportunity. They also indicated they would be willing to allow the parents visits with A.D. if their parental rights were terminated.

The court also received several exhibits into evidence, including the report of the guardian ad litem, which recommended termination of parental rights. Following the hearing, the court entered an order terminating the parental rights of the mother and father, concluding both parents had abandoned A.D. pursuant to chapter 600A and termination was in the best interests of the child. Both parents appealed, but only the mother's appeal is before us.[6]

## II.      Standard of Review

We review termination proceedings brought pursuant to Iowa Code chapter 600A de novo. *See In re C.A.V.*, 787 N.W.2d 96, 99 (Iowa Ct. App. 2010). We are not bound by the district court's factual findings, but we do afford them weight, particularly findings regarding witness credibility. *Id.* Our primary concern is the best interests of the child. Iowa Code § 600A.1 ("The best interest of the child subject to the proceedings of this chapter shall be the paramount consideration in interpreting this chapter."); *see also C.A.V.*, 787 N.W.2d at 99.

---

[6] On December 21, 2015, the Iowa Supreme Court entered an order "dismiss[ing] the father's appeal for his failure to comply with the appellate rules."

### III.    *Discussion*

In a private termination proceeding, the petitioner must establish by clear and convincing evidence the statutory ground or grounds authorizing the termination of parental rights.  *See* Iowa Code § 600A.8; *In re R.K.B.*, 572 N.W.2d 600, 601-02 (Iowa 1998).  In addition, after proving the statutory ground or grounds, the petitioner must also prove that termination of parental rights is in the best interest of the child.  *See* Iowa Code § 600A.1; *R.K.B.*, 572 N.W.2d at 602.    While the best interests of the child is the primary concern of the termination proceeding, the interests of the parents must also be given due consideration.  *See* Iowa Code § 600A.1; *R.K.B.*, 572 N.W.2d at 601.

The mother contends there was not clear and convincing evidence she abandoned the child under Iowa Code section 600A.8(3)(b).  Abandonment of a minor child is one statutory ground for termination of parental rights authorized by chapter 600A.    *See* Iowa Code § 600A.8(3).    Chapter 600A defines abandonment of a minor child as "reject[ing] the duties imposed by the parent-child relationship, . . . which may be evinced by the person, while being able to do so, making no provision or making only a marginal effort to provide for the support of the child or to communicate with the child."  *Id.* § 600A.2(19).  More specifically:

> If the child is six months of age or older when the termination hearing is held, a parent is deemed to have abandoned the child unless the parent maintains substantial and continuous or repeated contact with the child as demonstrated by contribution toward support of the child of a reasonable amount, according to the parent's means, and as demonstrated by any of the following:
> (1) Visiting the child at least monthly when physically and financially able to do so and when not prevented from doing so by the person having lawful custody of the child.

(2) Regular communication with the child or with the person having the care or custody of the child, when physically and financially unable to visit the child or when prevented from visiting the child by the person having lawful custody of the child.

(3) Openly living with the child for a period of six months within the one-year period immediately preceding the termination of parental rights hearing and during that period openly holding himself or herself out to be the parent of the child.

*Id.* § 600A.8(3)(b).

In other words, section 600A.8(3)(b) requires a parent not living with a child to demonstrate a requisite level of contact with the child. *See In re G.A.*, 826 N.W.2d 125, 130 (Iowa Ct. App. 2012). The mother claims she was financially unable to visit the child at least monthly, and Timothy and Salenia stifled her efforts to communicate with the child. To support her contention, the mother states she and the father "made multiple phone calls that went unanswered, sent text messages to Tim, exchanged messages via Facebook, and made attempts to use Skype."

We acknowledge Timothy's testimony that at one point he blocked the mother and father's number from his phone because he felt he could not safely accept their barrage of heated communications during his work as an over-the-road truck driver. Although the mother had access to Timothy and Salenia's home phone number, she never tried to reach them at home. In any event, the mother's few and sporadic attempts to communicate over a period of nearly two years can hardly be characterized as "[r]egular communication." *See* Iowa Code § 600A.8(3)(b). The voluntary failure of a parent to maintain regular communication can justify termination. *See In re T.B.*, No. 14-1984, 2016 WL 530990, at *7 (Iowa Ct. App. Feb. 10, 2016) ("Since at least October 2011,

neither parent has visited T.B. or M.C., and even if we assume that their interest in visitation was frustrated by the guardian's actions, both the father and mother fail to satisfy the alternative means of regular communication with either the children or the children's guardian."); *In re A.M.M.*, No. 13-0627, 2014 WL 3928877, at *2 (Iowa Ct. App. Aug. 13, 2014) (finding that a mother's lack of contact with child for sixteen months and lack of contact with custodial father for twelve months prior to termination hearing was "a marginal effort, at best, to maintain regular communication" and justified termination, even assuming that father had prevented her from having visitation with child).

The mother claims the court failed to consider her intent to place A.D., temporarily, "in a better environment until she could safely be returned." A subjective intent by the parent to maintain the parent-child relationship unsupported by the acts specified in section 600A.8(3)(b) will not preclude a determination that the parent has abandoned the child. Iowa Code § 600A.8(3)(c); *see also G.A.*, 826 N.W.2d at 130-31 (recognizing that a parent's subjective intent does not preclude a finding of abandonment). Moreover, a showing of abandonment does not require total desertion; feeble contacts can also demonstrate abandonment. *In re M.M.S.*, 502 N.W.2d 4, 7 (Iowa 1993). Here, there is clear and convincing evidence in the record to show the mother has made only a marginal effort to communicate regularly with the child or the child's custodians, support the child, or otherwise maintain the parent-child relationship.

The mother also contends termination of parental rights is not in the child's best interests.

> The best interest of a child requires that each biological parent affirmatively assume the duties encompassed by the role of being a parent. In determining whether a parent has affirmatively assumed the duties of a parent, the court shall consider, but is not limited to consideration of, the fulfillment of financial obligations, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life.

Iowa Code § 600A.1. The record demonstrates the mother has failed to affirmatively assume the duties encompassed by the role of being a parent. "Parental responsibility demands affirmative parenting to the extent it is practicable and feasible under the circumstances." *G.A.*, 826 N.W.2d at 130 (citation omitted). Although the mother appeared to consider reentering the child's life on several occasions, her whim never amounted to more than just that. The record shows the mother has not demonstrated a continued interest in A.D. or made a genuine effort to maintain contact with the child. She has not established or maintained a place of importance in the child's life. Although the mother testified the child was "super excited" to see her at the termination hearing in February 2015, the fact remains that by that time A.D. had not seen the mother since April 2013, and the child viewed Timothy and Salenia's family as her own.

We affirm the decision of the juvenile court terminating the mother's parental rights pursuant to chapter 600A.

**AFFIRMED.**