# In the Iowa Supreme Court

No. 23–0579

Submitted September 12, 2024—Filed November 8, 2024

**In the Interest of J.V.,**

minor child,

**D.B.** and **M.B.,** guardians,

Appellants,

**J.V.,** mother,

Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Samantha Gronewald, judge.

A mother seeks further review of a court of appeals decision that terminated her parental rights, reversing a prior district court order. **Decision of Court of Appeals Affirmed; District Court Judgment Reversed and Case Remanded.**

Mansfield, J., delivered the opinion of the court, in which all participating justices joined. May, J., took no part in the consideration or decision of the case.

Mark R. Hinshaw of The Law Offices of Mark R. Hinshaw. West Des Moines, for appellants.

Cathleen J. Siebrecht of Siebrecht Law Firm, Pleasant Hill, for appellee.

**Mansfield, Justice.**

We are called upon to review the outcome of a private termination of parental rights case. As is often the case in the law, and especially in family and juvenile law, there are no perfect answers. A couple with older children volunteered to take care of the newborn child of an incarcerated mother who was struggling with methamphetamine addiction and had committed several crimes. When the mother relapsed, and later relapsed again, the couple stepped in both times and eventually became the child's guardians. When the mother prioritized her relationship with another methamphetamine addict with a criminal record over her relationship with her own child, the couple tried to encourage her unsuccessfully to prioritize her own child.

A few years later, circumstances have changed. The mother appears to have put her addiction behind her and made other improvements in her life. She wants to terminate the guardianship and raise her child herself. Yet for work-related reasons, the guardians have moved out of state with the child. The child has become integrated into the guardians' family and considers the guardians to be his parents. The guardians want to adopt the child.

Both the guardians and the mother have acted unreasonably at times. The guardians moved with the child out of state, first to Colorado and then to Texas, without informing the mother in advance or seeking permission from the court. Additionally, the guardians didn't disclose their new home addresses to the mother so she could send mail and gifts to the child. The mother did not have contact with her child except very intermittently, and even then only on the terms she wanted.

In the end, we must decide this case not by evaluating the parties' conduct but by applying Iowa Code section 600A.8. This leads us to conclude that the

mother abandoned her child within the meaning of that statute and that termination of the mother's parental rights is in the best interests of the child as also required by that statute. Therefore, recognizing our inability to achieve a perfect outcome, we affirm the decision of the court of appeals and reverse the judgment of the district court, remanding for further proceedings consistent with this opinion.

## I. Facts and Procedural History.

**A. Parties.** J.V., six years old at the time of the hearing, is the son of Mother and Father, who were never married. Father has not had any role in J.V.'s life and does not contest the termination of his parental rights. Mother does contest termination.

Mother has faced a number of challenges.[1] She suffers from schizophrenia and PTSD, has struggled with addiction to methamphetamines off and on for years, and has accumulated a significant criminal history. In December 2016, Mother pleaded guilty to theft in the second degree and forgery in Scott County, both class "D" felonies. That spring, while still serving her prison sentence for those offenses, Mother gave birth to J.V. Because Mother had not completed her sentence, J.V. was placed through a private nonprofit organization with a married couple who had volunteered to care for him. This couple would eventually become J.V.'s guardians.

**B. Early Developments.** A month after J.V. was born, Mother was granted supervised release. One of her release conditions was that she stay at the House of Mercy in Des Moines and complete its program. The House of Mercy is a

---

[1]Mother's parental rights to two other children were terminated. Mother testified that she had had these children about ten years earlier than J.V. She voluntarily allowed them to be adopted because she was "not ready to be a mother."

licensed rehabilitation facility that provides substance use disorder treatment as well as mental health treatment.

When Mother left prison, the couple returned J.V. to her. J.V. lived with Mother at House of Mercy from May 2017 through March 2018. During this time, the couple, who had cared for J.V. since his birth, remained active in his life, providing support to Mother and J.V. The couple were listed by Mercy as Mother's next of kin and were often called on to care for J.V.

**C. Mother's First Relapse.** Mother testified that while at the House of Mercy, she "had battles with methamphetamine addiction." When she relapsed in March 2018, she asked the couple to take care of J.V. on her behalf, which they did. For the next two months, J.V. lived at the couple's house. During that time, Mother struggled with her use of methamphetamine. By June, Mother was able to resume care, and J.V. was returned to her at the House of Mercy. As before, the couple continued to provide support to both Mother and J.V. while she remained at the House of Mercy.

**D. Mother's Second Relapse.** Mother graduated from the House of Mercy in November and together with J.V. moved into an apartment in West Des Moines. In April 2019, five months after leaving the program, Mother once again began using methamphetamine. The department of human services (DHS) became involved. At Mother's request, the couple again arranged for J.V. to live with them.

**E. The Guardianship Is Established.** DHS indicated that it would file a child in need of assistance (CINA) action unless Mother consented to a guardianship. Concerned that a CINA action might result in foster care for J.V., Mother and the couple discussed the possibility of the couple becoming J.V.'s legal guardians. Initially, Mother consented to the arrangement; however, she

later changed her mind. Despite Mother's objections, the court granted the guardianship petition in November. The court order established the couple as J.V.'s legal guardians.

The rights of a guardian, unlike those of a parent, are prescribed by statute and court order. Here, the guardians were required to "make reasonable efforts to facilitate the continuation of the relationship of [J.V.] and [Mother]." Iowa Code § 232D.402(4). In that regard, the order establishing the guardianship granted Mother visitation rights with J.V. from 3:30 to 7:00 p.m. on Wednesdays and from 11:30 a.m. to 2:00 p.m. on Sundays.

**F. Mother's Visitation with J.V.** Initially Mother exercised her visitation rights regularly and maintained good relations with the guardians. Mother met J.V. at church every Sunday to attend services with him and play with him. Every Wednesday, she would pick him up and bring him home with her for the afternoon or spend time with him at the guardians' house. The female guardian testified that during these months Mother was like "an auntie to my children."

Mother also initially attempted to buy a few items for J.V., such as snack items to be consumed during visitation, using her food stamps. Additionally, Mother once offered the guardians twenty dollars for J.V.'s support, but the guardians refused to accept the money. The female guardian is the vice president of a corporation, and the male guardian is a director of engineering. The guardians discouraged Mother from giving them money or items for J.V.'s sustenance but instead urged her to use her resources to take care of herself and become more stable in her own situation.

This positive relationship between Mother and the guardians began to sour after Mother began seeing a new boyfriend, Chris. Both Mother and the guardians were aware that Chris was a methamphetamine addict with a criminal

history. Mother acknowledged that Chris was "aggressive and dangerous to her and to everybody." Nevertheless, Mother wanted to bring Chris with her during her visits to see J.V. The male guardian refused to allow Chris into the guardians' home. He explained that "because of the involvement of her boyfriend, we did not want those visitations to happen in our home any longer because we didn't want this person in our home. So, we set them for public places like a park to visit in the interest of protecting [J.V.]."

Mother's visits with J.V. became less regular after she started dating Chris. Mother stated, "I was doing every Wednesday and every Sunday, but then opinions about boyfriend at the time, I just . . . started getting uncomfortable. Like I said, me and [the female guardian] would argue quite often . . . ." The male guardian explained that "there was back-and-forth between us on including her boyfriend, which she insisted upon, and we insisted that that not be the case. So there were not a lot of visitations that happened in that time."

In any event, by March or early April 2020, Mother stopped visiting J.V. altogether. She has not physically seen her son since that time. Mother's relationship with Chris lasted approximately six months.

**G. The Guardians' Petition to Terminate Mother's Parental Rights.**
The guardians reached out to Mother, urging her to begin seeing J.V. again. Their efforts were unsuccessful. On October 20, 2020, after seven months of minimal contact with Mother, the guardians filed a petition for termination of her parental rights. J.V.'s guardian ad litem (GAL) met with Mother at her apartment in West Des Moines that December. Mother admitted that she was still fighting with addiction and had used drugs the previous month. During the meeting, the GAL noted, "[Mother] last saw [J.V.] in March of 2020 and had a few video calls with

him throughout 2020. [Mother] indicated that the [guardians] have encouraged her to see [J.V.] but that she just hasn't exerted much effort to do that."

Mother called the GAL on February 16, 2021, to inform him that she had moved back to Davenport but that she intended to participate in the termination hearing scheduled for February 23. Mother was served notice that the hearing would be held at the Dallas County Courthouse in Adel, but it ended up being held instead by videoconference because of COVID-19 restrictions. Although the GAL sent Mother an email with the link for the videoconference, this notice was insufficient under our court's COVID-19 supervisory order. In any event, Mother did not appear for the videoconference hearing, and the district court granted the petition to terminate her parental rights. Mother timely appealed that decision, which was eventually overturned by the court of appeals in March 2022 because Mother had not been notified of her right to counsel, nor had she been given proper notice that the hearing would be by videoconference. *See In re J.V.*, No. 21–0437, 2022 WL 610554, at *2 (Iowa Ct. App. Mar. 2, 2022).

**H. Mother's Move to Davenport.** After moving to Davenport, Mother continued to have little contact with J.V. despite the guardians' urgings. The sole attempt by Mother to meet with J.V. in person occurred in the summer of 2021. Mother and the male guardian agreed to set up a visitation with J.V., but he wanted to meet her first separately to check on her condition. They met at a fast-food restaurant and agreed that Mother would visit J.V. at a park the next Sunday. Mother never showed up at the park; she later testified that she had been having car troubles and couldn't make the date. She never called the guardians to explain why she didn't show up to the meeting, nor did she attempt to reschedule the meeting or arrange any new plans for visitation.

That was Mother's last effort to schedule a visitation. When asked, "Did you attempt to have any other contact with your son after this . . . time period in the summer of 2021?" Mother answered, "No. I proceeded to attempt to go to the courts and talk to the courts, because I felt like we were not getting anywhere. We were butting heads all the time."

**I. The Guardians' Moves to Colorado and Texas.** In August 2021, the guardians and their family, including J.V., moved to Colorado for reasons related to the male guardian's work. The female guardian testified that it "took months to find [Mother] and tell her" about the move because Mother had no cellphone and was inconsistent in keeping up with the social media messaging service that was their primary mode of contact. When Mother eventually learned that the guardians had moved, she asked for their new address. The guardians declined to provide it. According to Mother, the guardians refused to tell her their new address "because of that one threat, they didn't give me the address because of my ex-boyfriend's threat." The content of the "threat" was unclear, but it seems to have been that the boyfriend and Mother would show up together at the guardians' home without their consent.

Following the move to Colorado, there continued to be little contact between Mother and J.V. Mother described it as "off and on barely at all because of the fact that I felt every time that me and [the female guardian] would talk, we would always argue or fight." In April 2022, Mother had a video call with J.V. for his fifth birthday. The call was stressful for J.V., who did not recognize his mother. According to the female guardian, Mother "was making comments about [J.V.] leaving with her, and kittens [Mother] had were his, and he has things to take care of there." After the video call, the female guardian asked Mother, "Can we set up weekly, monthly, anything consistently so it's not such a blind side for

him?" The female guardian testified that this request upset Mother and that she responded by accusing the female guardian of trying to control and manipulate her.

No regular schedule was established. In April, shortly after the court of appeals reversed the first order terminating parental rights, Mother sought the appointment of counsel so she could move to terminate the guardianship.

In August 2022, the male guardian's work again required the family to move—this time to Texas, where they currently reside. The guardians once again refused to give Mother their address. Rarely, Mother would get in touch with the female guardian, asking to speak with J.V.[2] According to the female guardian, Mother would say that "she wants a phone call but then won't set up a time." The female guardian explained, "[W]hen we say pick a time, then it's silence. Pick a date. Silence." Mother agreed that when she contacted the female guardian, they would discuss establishing a schedule for speaking with the five-year-old J.V. but not get beyond that point. Mother stated, "I want to see my son more than anything. I mention it and then [the female guardian] says that . . . I really haven't talked about setting up times. It's always let's have an adult conversation." Ultimately, no schedule for contact between Mother and J.V. was made.

Mother and the guardians also had difficulties maintaining a reliable channel of communication. Mother stopped using the social media messaging service that had been the most reliable means of contact between Mother and

---

[2]The record is not clear as to exactly how many times Mother contacted the female guardian after the guardians moved out of state, but clearly it wasn't often. The male guardian testified it was less than five times in the year before termination. Mother said it was "a lot more" but gave only two examples of such contacts, one of which the female guardian had previously described in her testimony.

the guardians. Mother admitted that she "just kind of got rid of [the messaging service] because it's drama" and she no longer "use[d] it as much."

Mother did not dispute that she always had access to the guardians' cellphone numbers. She had not contacted the male guardian on his cell number for several years by the time of the hearing. Mother testified that she did text the female guardian from her new cellphone. The female guardian confirmed that she received this message from a then-unknown number. The female guardian testified, "[Mother] asked me for a video on Christmas day [2022]. Which it was from a random number that I did not have in my phone . . . ." The guardians declined to send a video of J.V. to the unknown number.

Meanwhile, Mother maintained that her court-appointed counsel in the guardianship case had failed to communicate with her despite multiple texts and phone calls. She filed a pro se request for new counsel and for access by video to J.V. in early November.

Disagreements over whether regular calls should be scheduled and inconsistent means of contact were not the only issues between the parties. On New Year's Day 2023, after Mother had confirmed her cellphone number with the guardians, Mother again contacted them asking for a video of J.V. The guardians refused. The male guardian explained, "We interpreted that as a phone call. If she wanted to have a phone call communication with him. And we asked [J.V.], Do you want to talk to your mom, and his answer was no."

**J. The Renewed Termination Hearing.** The renewed termination hearing began in late January 2023. It was conducted by video conference. By then, J.V. was nearly six years old and a part of the guardians' family. He referred to his female guardian as "mom," his male guardian as "dad," and their three biological daughters as his "sisters." He was attending kindergarten at the same

elementary school as the youngest of those daughters, while the two older daughters attended the connected middle school. The guardians intended to adopt him into the family should Mother's parental rights be terminated. The GAL reported to the court in favor of terminating Mother's parental rights.

At the time of this hearing, Mother had made significant strides in her life. She had a cellphone, an automobile, and a valid driver's license. She was attending classes and had regular employment, earning $1,200 a month. She was being supported by her own mother and stepfather, and her relationship with them had improved.[3] Additionally, Mother was regularly seeing a therapist and a psychiatrist and had been told that her mental health was such that medication would not be necessary. In the words of the GAL: "She may very well be in a position now to parent a young child . . . ."

However, Mother had not spoken to J.V. in eight months. As noted, the last call had left J.V. distressed because he didn't recognize that the person calling was his mother. Mother had not seen J.V. in person in three years. When Mother called J.V. nineteen days prior to the termination hearing, J.V. had not wanted to speak with her. At the hearing, Mother credited the guardians as follows: "I understand that they have always pushed -- wanted me to see my son and they have cared very much for him . . . ." Yet her view was that J.V. "deserves and has deserved for a long time now" to be with his mother.

**K. The District Court's Ruling.** At the conclusion of the hearing, the district court denied the guardians' petition to terminate Mother's parental rights. The court noted the following:

> When Petitioners initiated this matter, they resided with their
> family and the minor child in Waukee, Iowa. During this period of

---

[3]Over the years, Mother's mother had ongoing contact with both J.V. and the guardians. She provided some information about J.V. to Mother.

time, Petitioners were hesitant to allow Respondent contact with the minor child given some of her life choices and placed certain terms and conditions on her visits. They placed similar restrictions on Respondent's ability to communicate with the minor child as well. While the Court does not fault Petitioners for their decisions, the Court also cannot fault Respondent for not maintaining regular visits or communication with the minor child as a result of these decisions.

From Waukee, Iowa, Petitioners moved with the minor child to Colorado and then Texas where they continue to reside today. Again because of certain life choices made by Respondent, Petitioners did not provide Respondent with their home address in either state. Accordingly, although it is undisputed that Respondent would not have been financially able to visit the minor child in Colorado or Texas, she was prevented from doing so by Petitioners. Further, without Petitioners' home address, it shut the door on Respondent's ability to send cards, letters, or gifts to the minor child.

Petitioners testified that they did not want or need financial support from Respondent for the minor child. Further, Petitioner [female guardian] testified that she knew Respondent was unable to provide regular financial support. Regardless, the evidence presented is that Respondent did, when she was financially able and allowed to do so by Petitioners, provide gifts; food; and supplies for the minor child.

For all these reasons, the Court finds that the statutory ground in Iowa Code section 600A.8(3)(*b*)(1) and (2) have not been met.

At the same time, the district court—aware that Mother wanted to terminate the guardianship—expressed its hope that Mother would "attempt to build a relationship with the minor child before pursuing any type of action in the guardianship case as that would certainly be in the minor child's best interests."

The guardians appealed the decision, arguing that (1) the district court erred in determining Mother did not abandon J.V., (2) J.V. would be at risk of abuse and neglect if returned to Mother's custody, and (3) termination of

Mother's parental rights was in J.V.s' best interest. We transferred the case to the court of appeals, which reversed and remanded.

**L. The Court of Appeals Decision.** The court of appeals found that the guardians had proved by clear and convincing evidence that Mother had abandoned J.V. and that termination of Mother's parental rights was in the best interests of the child. *See* Iowa Code § 600A.8(3)(*b*) (2022).

According to the court of appeals, the district court had erred in finding the guardians had placed restrictions on Mother that prevented her from visiting or maintaining regular contact. The court pointed out:

> [T]he record does not show the guardians placed excessive restrictions on the mother's ability to communicate with the child. In fact, the record indicates quite the opposite. There was ample testimony, by both the mother and the guardians, that the efforts to reach out came from the guardians, not the mother.

The court determined that between April 2020 and the summer of 2021, the only restriction the guardians had placed on Mother related to the presence of her boyfriend.

One member of the court of appeals panel dissented. The dissent pointed out that "later conduct can negate what might otherwise be a finding of abandonment in at least some instances." The dissent took the view that Mother's attempts to remedy her earlier lapses had been thwarted by the guardians. The dissent observed that the guardians had failed to get prior court approval before moving out of state with J.V., as required by Iowa Code section 232D.401(4)(*b*). The dissent concluded that the guardians' decision to move out of Iowa prevented in-person contact, while their attitude toward remote communication prevented remote contact. The dissent noted, "[T]he guardians admitted they sometimes did not answer text messages that might have been from the mother if they did not recognize the phone number." The dissent added

that "at least once, [the guardians] refused to arrange a call or video because they put the decision in the child's hands."

We granted Mother's application for further review.

**II. Standard of Review.**

"We review proceedings terminating parental rights de novo." *In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014). "We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses." *Id.* (quoting *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010)).

**III. Legal Analysis.**

Private termination proceedings under Iowa Code chapter 600A are governed by a two-step process. *In re B.H.A.*, 938 N.W.2d 227, 232 (Iowa 2020). The petitioner first must prove by clear and convincing evidence the ground for termination, and then must prove by clear and convincing evidence that termination is in the best interests of the child. *Id.*

**A. Abandonment.** The fighting issue here is whether the guardians proved Iowa Code section 600A.8(3)(*b*) as a ground for termination. That section provides,

> If the child is six months of age or older when the termination hearing is held, a parent is deemed to have abandoned the child unless the parent maintains substantial and continuous or repeated contact with the child as demonstrated by contribution toward support of the child of a reasonable amount, according to the parent's means, and as demonstrated by any of the following:
>
> (1) Visiting the child at least monthly when physically and financially able to do so and when not prevented from doing so by the person having lawful custody of the child.
>
> (2) Regular communication with the child or with the person having the care or custody of the child, when physically and financially unable to visit the child or when prevented from visiting the child by the person having lawful custody of the child.

> (3) Openly living with the child for a period of six months within the one-year period immediately preceding the termination of parental rights hearing and during that period openly holding himself or herself out to be the parent of the child.

Iowa Code § 600A.8(3)(*b*). This statute places the burden on the guardians to show that Mother either (1) failed to contribute financially to J.V.'s support in a reasonable amount according to her means or (2) failed to maintain "substantial and continuous or repeated contact" with J.V.

As noted by the court of appeals dissent, although the statute "deem[s]" certain conduct by a parent to constitute abandonment, the burden is on the petitioner to establish that conduct by "clear and convincing proof." *Id.* § 600A.8; *see also In re M.M.S.,* 502 N.W.2d 4, 8 (Iowa 1993) (en banc) ("[W]hen termination is grounded on a claim of abandonment, the abandonment must be established by clear and convincing evidence before the courts are authorized to explore the issue of the child's best interests.").

1. *Financial contribution.* Mother's financial contributions to J.V.'s care have been minimal. Yet, Iowa Code section 600A.8(3)(*b*) only requires that the contributions be reasonable according to the parent's means. The guardians have acknowledged that Mother has never had the financial means to provide significant support for J.V. They never asked for support and encouraged her to spend her money on herself. Like the district court, we are not persuaded by clear and convincing evidence that Mother failed to make reasonable contributions to J.V.'s care.

2. *Substantial and continuous or repeated contact.* To recap, Mother has had no in-person visitation with J.V. since March or early April 2020, although the guardians did not move to Colorado until the summer of 2021. Even after the guardians moved out of state with J.V., Mother had very little phone contact

with J.V., with the last such call occurring in April 2022. Under ordinary circumstances, we would have little difficulty concluding that Mother's total lack of in-person contact with J.V. in the three years preceding the hearing and total lack of phone contact in the year preceding the hearing demonstrated a lack of substantial and continuous or repeated contact.

But this case involves extenuating circumstances. As noted by the district court, the guardians placed certain restrictions on in-person visits while they were in Iowa. They placed restrictions on phone calls and letters after they moved to Colorado and then Texas. The nature of the restrictions is generally not disputed. However, the district court concluded that the restrictions *justified* Mother's failure to continue to have contact; the court of appeals took the view that they *did not*. On our review, we agree with the court of appeals, which analyzed the matter in somewhat greater depth.

Concerning the period of time when the guardians resided in Iowa, the district court concluded that it could not "fault" either party for how they behaved. However, as noted by the court of appeals, the bottom line is that "there was no evidence to suggest the guardians prohibited visits by the mother." Under Iowa Code section 600A.8(3)(*b*), we conclude that Mother was physically and financially able to visit J.V. during this time and was not prevented from doing so by the guardians.

Mother lived only twenty minutes away in West Des Moines until she chose to move to Davenport in February 2021. Yet Mother did not visit J.V. at all during the year-and-a-half long period between March or early April 2020 and the guardians' relocation to Colorado. After Mother ceased visitation in March or early April 2020, the guardians reached out to her and tried to persuade her to continue seeing her son. Mother admitted to the GAL "that the [guardians] have

encouraged her to see [J.V.] but that she just hasn't exerted much effort to do that."

The guardians placed two restrictions. One was that Mother's boyfriend Chris could not come with Mother to the guardians' home. The other was the guardians' request for a "pre-meeting" in the summer of 2021 after Mother had not had in-person contact with J.V. for some time. Whether or not guardians should have drawn these lines in the sand, they didn't prevent Mother from visiting J.V. Mother's relationship with Chris lasted only six months. Following the pre-meeting, Mother did not show up for the subsequent visitation.

In her appellate brief, Mother argues that the guardians "denied visits." But she fails to cite to any specific support for this contention within the record.[4] Her argument is at odds with her testimony that the guardians "have always pushed -- wanted me to see my son and they have cared very much for him." When asked if they had ever denied Mother visits, the male guardian reiterated that her boyfriend would not be allowed in their house but that she would absolutely be allowed to visit J.V. together with her boyfriend so long as the visit occurred in a public space.

Iowa Code section 600A.8(3)(*b*) does not allow a parent to forgo in-person visitation in most circumstances. If the parent is physically and financially able to visit the child and not prevented from doing so, they must visit the child to avoid a finding of abandonment. *See* Iowa Code § 600A.8(3)(*b*)(1)–(2); *see also In re W.W.*, 826 N.W.2d 706, 711 (Iowa Ct. App. 2012) (holding that a Texas no-contact order could not avoid a finding that mother abandoned her child

---

[4]In this portion of the brief, Mother asserts that the guardians "denied visits" as one of a series of eight factual propositions. In support of all eight propositions, Mother cites thirty-six pages of the hearing transcript without specifying which proposition is supported by which page. A thorough review of all thirty-six pages reveals that none of them support Mother's argument—and some suggest the opposite.

where mother "took no legally-sanctioned steps to mitigate the harsh effects of that injunction"); *In re G.A.*, 826 N.W.2d 125, 130 (Iowa Ct. App. 2012) ("[W]hen physically and financially able and when not prevented by the child's custodian, the parent must visit the child at least monthly."). In our view, the record shows by clear and convincing proof that from March or early April 2020 until the guardians left Iowa almost a year and a half later, Mother did not physically see J.V., even though she was physically and financially able to visit her child in person and was not prevented from doing so.

We next examine the time period after the guardians moved out of state due to the male guardian's employment in August 2021. At the time, the district court's order terminating Mother's parental rights was on appeal. The guardians did not seek court approval to move J.V. out of state as they were required to do. *See* Iowa Code § 232D.401(4)(*b*). Nor did they notify the court of his new address. *See id.* § 232D.402(6) (requiring a guardian to "promptly notify" the court of change in the minor's permanent address). Despite the requirement for annual reporting*, see id.* § 232D.501(1)(*b*), the guardians failed to file any reports after the initial report filed shortly after the guardianship was established, let alone inform the court—or Mother—when they moved with their children and J.V. to Colorado and then to Texas. The guardians conceded that they knew Mother would not have the financial means to make monthly visits out of state. They also refused to share their address with her, effectively preventing her from physically visiting them. In sum, the guardians' actions meant Mother would be unable to make in-person visits.

Yet even when prevented from visiting the child, the parent still must maintain "[r]egular communication with the child or with the person having the care or custody of the child" to demonstrate that the parent is "maintain[ing]

substantial and continuous or repeated contact with the child." *Id.* § 600A.8(3)(*b*), (*b*)(2).

Once the guardians moved to Colorado, Mother admitted that she did not have much contact with J.V. She argued that the lack of communication primarily stemmed from disagreements between herself and the guardians.

> Q. So did you learn of the move to Colorado in 2021?
>
> A. Yes.
>
> Q. Okay. And at that point in time what kind of contact were you having with [J.V.]?
>
> A. It was off and on barely at all because of the fact that I felt every time that me and [the female guardian] would talk, we would always argue or fight.

We do not doubt that Mother felt uncomfortable speaking to the guardians. Still, this does not mean that the guardians prevented her from making regular contact with J.V. In fact, the record indicates that guardians not only allowed Mother to call and speak with J.V., they actively encouraged her to do so. Thus, when Mother was questioned by her own attorney, she testified as follows:

> Q. Do you feel that the [guardians] have made it difficult for you to have consistent contact with your son?
>
> A. In a small way, yes.

The only restriction imposed by the guardians on phone calls was that the calls be scheduled. The testimony of Mother and the guardians is consistent in this regard. We believe that asking for calls to be scheduled to avoid "spur of the moment" and "middle of the night" calls (in the female guardian's words) was reasonable. Enforcing reasonable rules for communication is not the same as preventing those communications. *See In re G.A.*, 826 N.W.2d at 129 (explaining that reasonable restrictions on visitation do not amount to prevention of

visitation). Prearranging times for speaking with a preschool-age child is justifiable.

Two other restrictions were not reasonable. The guardians refused to provide their home addresses in Colorado and Texas to Mother. Mother should have been permitted to send correspondence and gifts to J.V. via the mail. The vague testimony that Chris had made a threat was insufficient, especially after Mother was no longer seeing Chris. Also, it was inappropriate to allow J.V. a veto over whether to talk to his mother shortly before the termination hearing.

Nevertheless, these restrictions would not have foreclosed regular communication. Even without a mailing address, Mother could have employed other means of communication that she had used before—namely, the guardians' cellphone numbers and the messaging service. And the child veto happened only once, nineteen days before the renewed termination hearing. Had that communication between Mother and J.V. taken place, it still would have been only the second time Mother had spoken with J.V. that year. That is far from the regular communication that is necessary to maintain a parent–child relationship. We find that Mother did not maintain "regular communication" after in-person visitation became infeasible. Iowa Code § 600A.8(3)(*b*).

While we agree with the court of appeals dissent that "later conduct can negate what might otherwise be a finding of abandonment at least in some instances," Mother's limited efforts to make contact after the guardians moved out of state were not enough. For these reasons, we conclude that statutory abandonment has been established.

We acknowledge that the district court's factual findings are entitled to weight. The district court, after all, saw the witnesses live at the videoconference hearing. Here, though, the court's findings were fairly limited. Thus, the district

court found that the guardians "placed certain terms and conditions on [Mother's] visits" and "similar restrictions on [Mother's] ability to communicate with the minor child." It then concluded that it "cannot fault [Mother] for not maintaining regular visits or communication with the minor child as a result of these decisions." Yet apart from stating that it did not "fault" Mother (or the guardians, for that matter), the district court did not explain how those conditions actually prevented visitation or, later, communication.[5] In fact, it never actually found that visitation or communication had been "prevented." *See* Iowa Code § 600A.8(3)(*b*); *see also id.* § 600A.8(3)(*c*) ("The subjective intent of the parent, whether expressed or otherwise, unsupported by evidence of acts specified in paragraph '*a*' or '*b*' manifesting such intent, does not preclude a determination that the parent has abandoned the child.").

**B. Best Interests of the Child.** Termination may not occur unless it is in the best interests of the child. *See* Iowa Code § 600A.1(1) ("The best interest of the child subject to the proceedings of this chapter shall be the paramount consideration in interpreting this chapter."); *In re B.H.A.*, 938 N.W.2d at 232; *In re R.K.B.*, 572 N.W.2d 600, 602 (Iowa 1998). As we have explained,

> For private termination proceedings, the Iowa legislature defined the concept of "best interest of a child" as the following:
>
> The best interest of a child requires that each biological parent affirmatively assume the duties encompassed by the role of being a parent. In determining whether a parent has affirmatively assumed the duties of a parent, the court shall consider, but is not limited to consideration of, the fulfillment of financial obligations, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life.

---

[5]"[J]uvenile law is not a fault-based edifice like tort law." *In re Z.P.*, 948 N.W.2d 518, 523 (Iowa 2020) (per curiam).

*In re B.H.A.*, 938 N.W.2d at 232 (quoting Iowa Code § 600A.1). In the same case, we went on to say,

> This court has also borrowed from the statutory best-interest framework outlined in Iowa Code chapter 232. *In re A.H.B.*, 791 N.W.2d 687, 690–91 (Iowa 2010). That framework directs this court to "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child[.]" Iowa Code § 232.116(2). Of importance is the child's emotional and psychological health, *see id.*, and the closeness of the parent–child bond, *see id.* 232.116(3)(*c*). Finally, this court has said, "It is well-settled law that we cannot deprive a child of permanency after the [petitioner] has proved a ground for termination . . . by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." *A.H.B.*, 791 N.W.2d at 691 (alteration in original) (quoting *In re P.L.*, 778 N.W.2d 33, 41 (Iowa 2010)).

*Id.* (alteration and omission in original).

We agree with both the court of appeals majority and the court of appeals dissent that termination is in the best interest of J.V. While Mother should be lauded for all the steps she has taken in her life, she has not affirmatively assumed the duties of a parent since J.V. was two years old. J.V. has lived with the guardians for all but a year of his life, and his time with them has been uninterrupted since he was two. As noted by the court of appeals dissent, "The mother is essentially a stranger to her son." We agree with the GAL's assessment: "[J.V.] has had very little contact with [Mother]. To [J.V.], [the female guardian] is Mom and [the male guardian] is Dad and their three children [are] his siblings." J.V. has a loving and nurturing family that he regards as his own. Granting this petition for termination will allow guardians to proceed with their plan for adoption, which will give J.V.'s formative years added stability and permanency. *See In re R.K.B.,* 572 N.W.2d at 602 (citing the fact that the child does not recognize the natural father and the stepfather's willingness to adopt the child as factors making termination in the child's best interest). As noted by the court

of appeals dissent, "I . . . have trouble conceiving how the child could be returned to the mother without causing severe emotional trauma that would outweigh any benefits to him of connecting with his biological mother."

**IV. Conclusion.**

For the above reasons, we affirm the decision of the court of appeals and reverse and remand the judgment of the district court with instructions to enter an order terminating the parental rights of the mother.

**Decision of Court of Appeals Affirmed; District Court Judgment Reversed and Case Remanded.**

All justices concur except May, J., who takes no part.