**IN THE COURT OF APPEALS OF IOWA**

No. 25-0430
Filed October 29, 2025

**IN THE INTEREST OF K.E.,**
**Minor Child,**

**B.E., Father,**
    Petitioner-Appellee,

**N.M. a/k/a J.T., Mother,**
    Respondent-Appellant.

_____

Appeal from the Iowa District Court for Crawford County, Kristal L. Phillips,

Judge.


A mother appeals the termination of her parental rights to her child.

**AFFIRMED.**


Whitney A. Estwick of Estwick Law, LLC, Omaha, Nebraska, for appellant

mother.

Maura Sailer of Sailer Legal, PLLC, Denison, for appellee father.

Ryan T. Gaskins of Boerner & Goldsmith Law Firm, P.C., Ida Grove,

attorney and guardian ad litem for minor child.


Considered without oral argument by Tabor, C.J., and Greer and Buller, JJ.

**GREER, Judge.**

In November 2024, the father, B.E., petitioned to terminate the parental rights of the mother, N.M. a/k/a J.T., to their child, K.E., born in early 2018. After a hearing the following January, the juvenile court heard evidence and issued an order terminating the mother's parental rights finding that the mother abandoned the child and failed to contribute toward the child's support without good cause. The mother appeals from that ruling, arguing that a July 2022 custodial order should govern the relationship and avoid the termination of her parental rights and that the father did not meet his burden to prove abandonment.

We find the father established a ground for termination that the mother abandoned the child as defined in Iowa Code section 600A.8(3)(b) (2024), and that it is in the best interest of the child to terminate the mother's parental rights.

**I. Facts and Procedural Background.**

B.E. and N.M. never married. They lived together with K.E. for about four years, until the parents separated and the father applied for a custodial order. On May 5, 2022, the district court awarded the father primary physical care of the child.[1] In an extensive decision that was made part of the record in this case, the district court "reluctantly approve[d] the parties' agreement for joint legal custody," finding that the "evidence [wa]s overwhelming that [the mother] is not a suitable full-time care giver for K.E." The mother was awarded limited visitation consisting

---

[1] The district court noted that a preferrable option to meet the child's best interest might have been a third party, but it did not have that option available to it. The mother and several of her trial witnesses suggested that the paternal grandparents should be considered as a placement as they were extensively involved with the child.

of parenting time on Saturdays and Sundays from noon to 8:00 p.m. every other weekend and each Tuesday after school to 8:00 p.m. with no overnights. The district court ordered minimal child support given the mother's limited earnings based upon her disability status.

After this decision was filed, the mother stopped all contact with the child, stating that it would be easier on the child if she didn't see the mother at all. She told the family-centered services provider (FCS) that "[the father] wanted [the child] so now he can have and handle that whole responsibility on his own." It was also around this timeframe that the Iowa Department of Health and Human Services (HHS) initiated child abuse investigations involving the mother's live-in paramour, a registered sex offender, and K.E. "In total, HHS looked into three reports related to the mother's supervision and her decision to allow a sex offender to live with the child."[2] From that point, the mother's visitation with the child became sporadic—and in some of the months, nonexistent—even though the mother lived in the same small town as the father and the paternal grandparents, with whom the child spent significant time. In June 2022, after the mother had not connected in any manner with the child for about a month, the mother told the FCS provider that she was considering terminating her parental rights. By August, the mother reengaged but did not exercise all of her allowed visitation under the custodial order, often returning the child home early during the visits. Visits were sporadic in 2023 as

---

[2] A February 2021 child abuse report was founded for the denial of critical care for failure to provide proper supervision. A second report was initiated in April of 2022 for allowing access to a registered sex offender, her paramour. There was a third founded investigation after the mother allowed her paramour to be alone with the child. Ultimately, the paramour was criminally charged with sexual assault against the child.

well, and according to the father, the mother went many months without seeing the child.

During the summer of 2024, the father sent the child to live with his parents without consulting the mother. As the mother testified, she went seven months that year without visiting the child, although she later testified the seven months were in 2022. Then in October, the mother appeared unannounced for a visit at the paternal grandparents' home. After that visit she started exercising some visitation and maintained monthly contact with the child from that point until the termination hearing in January 2025.

At the time of the termination trial, the seven-year-old child continued to reside with the paternal grandparents, with the father exercising visitation every other weekend and on other occasions. It was reported that the child was thriving in their care. Both the mother and father testified at the trial, along with the paternal grandfather and grandmother, and the maternal grandmother and great-grandmother. After weighing their testimony, the juvenile court terminated the mother's parental rights. She appeals that decision.

## II. Standard of Review.

"Private termination proceedings under [Iowa Code] chapter 600A are reviewed de novo." *In re B.H.A.*, 938 N.W.2d 227, 232 (Iowa 2020). Still, "we give weight to the trial court's findings of fact, especially when considering credibility of witnesses." *In re R.K.B.*, 572 N.W.2d 600, 601 (Iowa 1998). "The primary interest in termination proceedings is the best interests of the child." *Id.*

**III. Discussion.**

*Abandonment.*

Because this case involves a private termination proceeding filed by a parent, we employ a two-step process under Iowa Code chapter 600A. *See B.H.A.*, 938 N.W.2d at 232. "First, a petitioner must show 'clear and convincing' evidence that one or more [statutory] grounds for termination exist. Second, the petitioner must prove that termination is in the child's best interest." *In re L.H.*, No. 24-1558, 2025 WL 1177879, at *2 (Iowa Ct. App. Apr. 23, 2025) (internal citation omitted). The father was required to prove the grounds for termination by clear and convincing evidence. *See In re G.A.*, 826 N.W.2d 125, 128 (Iowa Ct App. 2012).

The juvenile court found termination was proper under subsection 600A.8(3) as to both abandonment by lack of contact and by lack of financial support. We have discussed the considerations involving proof of abandonment under this section as requiring:

> clear and convincing evidence the parent for whom termination is sought has failed to maintain "substantial and continuous or repeated contact with the child." Substantial and continuous or repeated contact with the child is shown by: (1) financially contributing to the support of the child in a reasonable amount according to the parent's means ("cash"), and (2) maintaining sufficient contact with the child as defined in section 600A.8(3)(b)(1)–(3) ("contact"). For a parent to avoid being deemed to have abandoned the child, the parent must meet *both* the cash and contact components of the statute. So a petitioner need only prove by clear and convincing evidence that the parent failed to meet one of the two components, cash or contact, to establish the parent abandoned the child. Put another way, even if the parent has contributed toward support of the child in a reasonable amount under section 600A.8(3)(b), if the parent failed to maintain contact with the child as shown under section 600A.8(3)(b)(1)–(3), the parent may be deemed to have abandoned the child. And vice versa.

*In re G.D.*, No. 20-0984, 2021 WL 2126174, at *3 (Iowa Ct. App. May 26, 2021).

We turn to the question of whether the father showed by clear and convincing evidence that the mother failed to maintain "substantial and continuous or repeated contact" with the child.[3] *See In re J.V.*, 13 N.W.3d 595, 604 (Iowa 2024). "This is a significant burden—the highest burden in civil cases. We impose this burden on the petitioners to prevent an erroneous and irreparable deprivation of a parent's right to raise his or her child[]." *In re E.S.*, No. 16-0066, 2016 WL 7403746, at *3 (Iowa Ct. App. Dec. 21, 2016). In the father's petition he alleged that:

> Until June 2024, [the mother] lived a few houses away from [the child]. On July 8, 2022, the Court granted [the mother] the right to visit with [the child] at least two times each month. Since that time, [the mother] has failed to see [the child] in the following months: July 2022, August 2022, September 2022, October 2022, November 2022, December 2022, February 2023, March 2023, April 2023, May 2023, July 2023, September 2023, January 2024, April 2024, June 2024, July 2024, August 2024, and September 2024.[4]
>
> In all the months that [the mother] failed to visit [the child] she communicated with [the father] about [the child] in September 2024 and October 2024 only.

---

[3] While the juvenile court also relied upon grounds under section 600A.8(4) relating to the financial support of the child, we choose to focus only on the ground under section 600A.8(3)(b). "When the juvenile court orders termination of parental rights on more than one statutory ground, we need only find grounds to terminate on one of the sections to affirm." *In re T.S.*, 868 N.W.2d 425, 435 (Iowa Ct. App. 2015).

[4] At trial, the mother produced photographs of her and the child, allegedly dated September 17, 2022, February 8, 2023, January 1, 2024, and June 30, 2024. She argues this evidence refutes the father's claims for those particular months, but there were disputes over when the photographs were taken.

The mother admits that there were times she was not engaging in regular contact with the child but asserts that in the years between July 2022 and September 2024, the father impeded her attempts to exercise visitation, she did not have transportation, she was ill, and she was not allowed because of her paramour's behavior towards the child. But those excuses do not ring true based upon the evidence at trial. In 2022, the mother did not take advantage of most of her scheduled visitation and the notes of the FCS worker establish that was a choice the mother made. This was when the mother lived a short distance from where the child resided, so we cannot credit the mother's claim that transportation was an issue. And there is no evidence that HHS was prohibiting the mother's visitations in 2022; in fact, the FCS provider tried to encourage the mother to visit. On top of that, the evidence reflects that the mother did not engage in visitation with the child for many months in 2023. And we note her disengagement is further shown by her failure to make any voluntary child support payments for two years.

The mother claims text messages between her and the father show that he thwarted her visitation efforts and it was not until the child moved in with the paternal grandparents that she could exercise visitations. Even if we accept that description as true, the mother's evidence did not show that the father expressly denied visits or what the mother did to pursue the rights under the court order related to her visitation. And while the record is not crystal clear as to what dates there were visitations in early 2024, the paternal grandparents testified there were no visits between early June and October 2024, when the mother showed up unannounced for a visit. They further testified that the mother missed fourteen out of twenty allowed visits between the mother's reengagement with visits the fall

of 2024 and the time of trial in January 2025. The grandfather confirmed that the mother never called to reach out to the child.

And related to the communication with the father, he testified he was trying to reach the mother to initiate counseling for the child and he could not reach her because she kept changing phone numbers. The father explained that when the mother did try to exercise a visitation she would

> be gone for, you know, months at a time, and then all of a sudden, "I'm back again. I'm going to get back into her life." And it's, like, you know, she's already gone through all the mourning and stuff and thinking that her mom doesn't want her, and then all of a sudden, she wants to just pop back up again and then have a couple visits and then be gone again for months on end.

And in reading the text messages between the father and mother, we do not see a pattern where the father is denying contact between the mother and child.

We recognize that the mother ramped up her visitation time after the termination petition was filed. However, we choose to view the bigger picture rather than focusing on her last-minute effort to negate a finding of abandonment. *See In re M.M.S.*, 502 N.W.2d 4, 8 (Iowa 1993) (noting a parent's "feeble contacts" in the face of looming termination failed to overcome evidence of prior abandonment). Even after the petition was filed, the mother still missed fourteen out of twenty available visits. Before that petition was filed the mother, at one point, testified that she had not visited the child for "seven months straight." And,

> the phrase to abandon a minor child is defined in section 600A.2(19) to mean that a parent rejects the duties imposed by the parent-child relationship and makes no provision or only a marginal effort to provide for the support of the child or to communicate with the child. Abandonment is characterized as the giving up of parental rights and responsibilities accompanied by an intent to forego them.

*In re C.A.V.*, 787 N.W.2d 96, 101 (Iowa Ct. App. 2010) (cleaned up). So we cannot ignore the over two-year period that the mother failed to provide any financial support and mostly was missing from taking any responsibility for her role as a parent. Proof of "total desertion is not required for a showing of abandonment." *M.M.S.,* 502 N.W2d at 8.

We find the father met his burden to show by clear and convincing evidence that the mother did not sustain monthly in-person visitation or regular communication. *See* Iowa Code § 600A.8(3)(b)(1)–(2). "[P]arental responsibilities include more than subjectively maintaining an interest in a child. The concept requires affirmative parenting to the extent it is practical and feasible in the circumstances." *In re Goettsche*, 311 N.W.2d 104, 106 (Iowa 1981). The mother exhibited a lack of interest in the child since the custody determination in 2022 until shortly before the petition was filed. We do not find her excuses credible. In our de novo review of the overall picture established by the evidence, we find that the mother abandoned her parental responsibilities to the child.

### *Best Interest.*

Once statutory basis for termination is shown, we move to step two of our analysis—the best interest question. *See In re Q.G.*, 911 N.W.2d 761, 770 (Iowa 2018). "In addition to applying the language of Iowa Code section 600A.1, we have also borrowed from Iowa Code section 232.116(2) and (3) to flesh out the best-interest-of-the-child test." *Id.* at 771. In the second step, the father had to prove by clear and convincing evidence that termination is in the best interest of the child. *See J.V.*, 13 N.W.3d at 603. Here too, we find the father met his burden.

The inconsistency of the visits, after months of missing contact, has taken its toll on the child. The paternal grandparents explained behavior outbursts that the child experiences. After the visit in October 2024, the paternal grandmother discussed how the child began acting out and brought up the sexual-abuse incident with the mother's previous paramour. The child then ripped up a box of tissues yelling she hated the paramour and hated her mother. The father noted that child had "rage issues." The child is getting special help to manage her emotional outbursts, including medication management, school therapy, and visiting with a psychiatrist. Her school is working diligently to de-escalate her emotions as well.

The record is clear that, within the context of her parental grandparents' care, the child enjoys present stability and the promise of long-term nourishment. *See M.M.S.*, 502 N.W.2d at 9 (finding the best interest question was "not . . . at all close," and the child would remain in stable home environment following termination of incarcerated father's rights). Preserving the rights of the mother—who has shown only an occasional desire to parent, and who has previously placed her own romantic interests before the safety of her child—would only put K.E.'s future stability at risk. Thus, considering the child's long-term interests, and in light of the mother's past behavior, we find termination of the mother's parental rights to be in the best interest of the child. We therefore affirm the juvenile court's termination of the mother's parental rights.

**AFFIRMED.**